FEITLIN, YOUNGMAN, KARAS
& GERSON, LLC
Jonathan M. Ettman, Esq.
Heritage Plaza II
65 Harristown Road, Suite 207
Glen Rock, New Jersey 07452
☎201-791-4400   📠201-791-5659
✉ JEttman@fykglaw.com
*Attorneys for plaintiff, Express Freight Systems Inc.*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| EXPRESS FREIGHT SYSTEMS INC., <br><br>*Plaintiff,*<br><br>v.<br><br>YMB ENTERPRISES INC., JOEL MENDLOVIC, JOHN DOES 1-10 and ABC CORPS. 1-10 (said names being fictitious),<br><br>*Defendant(s).* | Civil Action No.: 1:20-cv-00186-ARR-LB<br><br>*Civil Action*<br><br>***PLAINTIFF'S RULE 56.1(a) STATEMENT OF UNDISPUTED MATERIAL FACTS*** |

Plaintiff Express Freight Systems, Inc. ("Plaintiff") alleges as its Statement of Undisputed Material Facts in support of its Motion for Summary Judgment in its favor and against defendant YMB Enterprises, Inc. ("Defendant") as follows:

1. Plaintiff is a transportation broker in the business of arranging for the interstate and intrastate transportation of freight by motor vehicle. Plaintiff specializes in arranging for the hauling of freight for companies in the food industry. [Certification of Rodney Weltman ("Weltman Cert.") ¶3].

2. Rodney Weltman has owned and operated Plaintiff since 2005 and has been working as a broker in the freight hauling industry since 1995. [Weltman Cert. ¶3].

3. A party who retains a transportation broker to arrange for the transportation of freight pays the broker for its services, not the carrier who transports the freight. The carrier does not contract with or receive payment from the party who retains the broker. [Weltman Cert. ¶4].

4. The broker's profit from arranging for the transportation of freight is based on the difference between the amount paid to the broker by the party who retained the broker and the amount paid by the broker to the carrier. [Weltman Cert. ¶4].

5. The party retaining the broker to arrange for transportation is the broker's customer. [Weltman Cert. ¶5; Exh. C to Certification of Jonathan M. Ettman, Esq. (hereinafter "Mendlovic Dep.") 151:17-24].

6. The party retaining the broker to arrange for transportation is not the carrier's customer. [Id.].

7. Beginning in 2013, Plaintiff began receiving requests from Furmano Foods, Inc. ("Furmano"), a family-owned food manufacturing company located in Northumberland, Pennsylvania, to arrange for transportation of freight from Furmano's location in Pennsylvania to its customers in New York. [Weltman Cert. ¶6].

8. Plaintiff developed a relationship with Furmano by providing competent, reliable service. [Exh. B to Ettman Cert. (hereinafter "Stuckey Cert.") ¶5].

9. At no time did Chip Stuckey or anyone else from Furmano complain to Plaintiff about Plaintiff's work or otherwise give any indication of any displeasure with Plaintiff's work. [Weltman Cert. ¶8; Stuckey Cert. ¶8].

2

10. In July of 2018, Plaintiff posted an advertisement on an industry website called "Power.dat.com", seeking carriers interested in transporting freight from Furmano. [Weltman Cert. ¶9].

11. The advertisement identified Furmano as Plaintiff's customer and contained the date of pick up from Furmano, the date of delivery to the destination and the type of equipment needed to haul the load. [Weltman Cert. ¶9].

12. Defendant's representative, Volvie Mendlovic ("Mendlovic"), saw Plaintiff's advertisement seeking carriers to transport freight from Furmano back to New York City and contacted Plaintiff, requesting to be hired for the job. [Mendlovic Dep. 43:1-14].

13. Mendlovic was Defendant's office manager in 2018, and was the only one responsible for arranging transportation jobs for Defendant. [Mendlovic Dep. 39:13-19; 8:16-9:22].

14. Defendant was familiar with Furmano because it had been set up on jobs there by other brokers, but prior to July 26, 2018, Defendant had never done any work directly with Furmano, and Furmano had never paid Defendant nor entered into any contract with Defendant. [Exh. A to Weltman Cert.; Mendlovic Dep. 44:2-11; 76:13-77:7; Stuckey Cert. ¶7].

15. On July 26, 2018, Defendant was presented with Plaintiff's standard contract (the "Contract"). Defendant signed the Contract and returned the signed copy to Plaintiff without requesting any changes or raising any concerns or questions regarding any of the terms therein. [Weltman Cert. ¶11; Exh. B to Weltman Cert.; Mendlovic Dep. 79:14-17].

16. Neither Mendlovic nor anyone else acting on Defendant's behalf disclosed to Plaintiff that Defendant had transported freight from Furmano's facility in Pennsylvania prior to

3

entering into the Contract or that Defendant considered Furmano its customer. [Weltman Cert. ¶10; Mendlovic Dep. 79:18-80:20].

17. Pursuant to the Contract, Plaintiff agreed to offer for shipment, and Defendant agreed to transport on its own equipment, at least 100,000 pounds of freight annually in a series of jobs as may be tendered by Plaintiff as broker. [Exh. B to Weltman Cert.].

18. Paragraph 3 of the Contract provides that the Broker agrees to offer for shipment to the Carrier at least 100,000 pounds annually in a series of shipments and additional quantities of freight as the Broker may tender. [Exh. B to Weltman Cert.].

19. Paragraph 11 of the Contract contains a no-contact/non-solicitation provision preventing Defendant from having direct contact with, or soliciting, any of Plaintiff's customers. [Id.].

20. In particular, Paragraph 11 of the Contract states:

> CARRIER agrees to support and protect BROKER'S efforts in performance of this agreement by refraining from ANY direct contact or solicitation of BROKER'S customers. During the term of this agreement and for a period of 2 years from the time of termination of this agreement, CARRIER shall not directly or indirectly solicit or do business of a transportation or warehouse nature with any of BROKER'S customers who are serviced by CARRIER as a result of this agreement unless otherwise agreed to in writing.

[Id.]

21. In the event of Defendant's breach of the Contract, Plaintiff would be entitled to both (i) a commission from Defendant in the amount of twenty-five (25%) percent of the transportation revenue received on the movement of the traffic, and (ii) any damages that Plaintiff may incur. [¶11 of Ex. B to Weltman Cert.].

22. Pursuant to Paragraph 13 of the Contract, Defendant agreed that Plaintiff's compensation for its services was confidential, and that Defendant would not reveal to anyone

4

the terms of the Contract, the pricing of transportation services or any other details of the business conducted between the parties. [¶13 of Ex. B to Weltman Cert.].

23. The no-contact/non-solicitation provision of the Contract serves to prevent the carrier from arranging its own transportation jobs directly with customers of Plaintiff because if the carrier were permitted to then solicit and do business directly with Plaintiff's customers with impunity, then the customer and the carrier would no longer require Plaintiff's services and Plaintiff's business would suffer greatly. [Weltman Cert. ¶15].

24. The no-contact/non-solicitation provision of the Contract also serves to preserve the good will established between Plaintiff and its customers by ensuring that any issues, concerns or problems arising from a job performed for the customer is addressed by Plaintiff and not the carrier. [Weltman Cert. ¶16].

25. No-contact/non-solicitation provisions such as the one in Paragraph 11 are standard throughout the freight hauling industry as transportation brokers are concerned with protecting their relationships with customers and preventing carriers from competing with the brokers or otherwise damaging Plaintiff's relationship with the customer. [Weltman Cert. ¶17].

26. In the transportation industry, freight brokers do not want carriers who they assign to transport freight to solicit work from the party who hired the broker. [Mendlovic Dep. 25:6-11; 27:17-25].

27. In the transportation industry, when a broker provides a service, it does not want its customer to be doing business directly with any carriers as the broker does not want to lose the customer's business. [Mendlovic Dep. 28:14-29:5].

28. When Defendant enters into arrangements with transportation brokers, it is Defendant's understanding that the broker expects that Defendant will refrain from seeking to do

5

work directly with the party to which the broker assigns Defendant to transport freight. [Mendlovic Dep. 20:17-21:9].

29. Defendant understands that the broker would not want Defendant to try and work out a deal directly with the broker's customer while Defendant is working under an agreement with the broker. [Mendlovic Dep. 21:10-15].

30. If the carrier is doing work for the broker then it is working for the broker and should not be soliciting work from the broker's customer. [Mendlovic Dep. 22:13-23:1].

31. In the transportation industry, carriers hired by brokers should refrain from soliciting business directly from the party who hired the broker. [Mendlovic Dep. 25:6-11].

32. Mendlovic never attempted to clarify Paragraph 11 of the Contract with Plaintiff to ensure that Defendant would not be prevented from doing business directly with anyone it had previously done business with before entering into the Contract with Plaintiff. [Mendlovic Dep. 78:7-79:6].

33. Mendlovic never gave Plaintiff the names of anyone who Defendant had previously done business with or otherwise attempt to create exceptions to the constraints contained in Paragraph 11 of the Contract. [Mendlovic Dep. 79:18-80:20].

34. The Contract did not allow for Defendant to have direct contact with Plaintiff's customers just because Defendant may have done prior business with the customer. [Mendlovic Dep. 64:4-65:11].

35. Following the parties' entry into the contract, Defendant hauled freight from Furmano on at least nine (9) separate jobs arranged by Plaintiff, for which Plaintiff paid Defendant. [Weltman Cert. ¶19; Ex. C and D to Weltman Cert.; Mendlovic Dep. 94:9-95:7].

6

36. From 1990 until his retirement from full time employment in August 2020, Chip Stuckey was Manager of Logistics for Furmano. [Stuckey Cert. ¶1].

37. As Manager of Logistics, Chip Stuckey was responsible for arranging for the transportation of Furmano's freight, consisting of food products, from Furmano's facility in Northumberland, Pennsylvania to various of Furmano's customers throughout the country. [Stuckey Cert. ¶2].

38. In or around October 2018, Chip Stuckey was contacted by Volvie Mendlovic, an employee of Defendant, who inquired about Mr. Stuckey's interest in having Defendant perform transportation work directly for Furmano rather than Furmano utilizing Plaintiff to arrange the jobs, and offered to perform the transportation work for at least $100.00 less per load than what Plaintiff was charging Furmano. [Stuckey Cert. ¶6].

39. Although Defendant knew of Furmano, Furmano was not Defendant's "account", and any freight transported by Defendant prior to entering into the Contract with Defendant were arranged through brokers, and never directly with Furmano, and Furmano never paid Defendant. [Mendlovic Dep. 111:18-112:10; 149:12-150:12].

40. Stuckey decided to work with Defendant directly and beginning on or about October 18, 2018 and continuing through the end of December 2018, assigned Defendant jobs that would have otherwise been assigned to Plaintiff. All of these jobs took place after Defendant entered into the Contract with Plaintiff. [Stuckey Cert. ¶10; Mendlovic Dep. 101:18-22; Exhs. F & G to Weltman Cert.].

41. Defendant was aware that Plaintiff was still doing business with Furmano by no later than October 19, 2018, the day after Defendant's first job directly for Furmano on October 18, 2018, because Defendant did a job at Furmano arranged by Plaintiff on October 19, 2018. In

addition, Defendant did jobs directly for Furmano and for Plaintiff on October 22, 2018. [Ex. C and G to Weltman Cert.].

42. Furmano paid Defendant a total of $41,000.00 for the jobs Defendant performed directly for Furmano. [Ex. F and G to Weltman Cert; Mendlovic Dep. 133:25-134:21].

43. Stuckey's decision to work directly with Defendant and give Defendant jobs that he would have otherwise given to Plaintiff was based on cost savings for Furmano, and had nothing to do with Plaintiff's performance as Stuckey was always pleased with Plaintiff. [Stuckey Cert. ¶8].

44. During the time Defendant was doing work directly for Furmano it was also doing work for Furmano on jobs arranged by Plaintiff. [Exh. C & G to Weltman Cert.]

45. Mendlovic did not divulge to Stuckey that Defendant was under Contract with Plaintiff. Nor did Mendlovic divulge to Stuckey that while Defendant was working directly with Furmano it was also periodically transporting freight from Furmano on jobs arranged by Plaintiff pursuant to the Contract. [Mendlovic Dep. 117:6-118:6].

46. Defendant stopped doing work directly for Furmano when Plaintiff contacted Defendant after learning of Defendant's work with Furmano from Chip Stuckey. [Mendlovic 139:17-141:8].

47. Defendant's first job directly for Furmano was on October 18, 2021, which was after Defendant entered into the Contract with Plaintiff. [Exh. G to Weltman Cert.].

48. Had Defendant not solicited Furmano and offered a lower rate than what Furmano had been paying Plaintiff, Furmano would have continued tendering loads to Plaintiff indefinitely in the ordinary or customary course of Furmano and Plaintiff's existing relationship, under their established pricing structure and workload/volume, because Furmano had high regard

8

for Plaintiff, and had developed a strong working relationship with Plaintiff, given that Plaintiff had established itself as reliable and easy to work with. [Stuckey Cert. ¶13].

49. Defendant apologized for working directly with Furmano and offered to pay commissions to Plaintiff. [Mendlovic Dep. 92:21-93:16; 142:8-17; 162:3-15].

50. On February 20, 2019, Plaintiff's owner, Rodney Weltman, filed a "Freightguard Report", on an industry-related website in which he set forth that Defendant had "back solicited" Plaintiff, meaning that Defendant transacted business directly with Furmano while under contract with Plaintiff. [Weltman Cert. ¶24; Exh. H to Weltman Cert.].

51. Volvie Mendlovic filed a response on the Freighguard Report in which he claims that Plaintiff contacted Defendant to move a load from Furmano and that Defendant told Plaintiff that Furmano was Defendant's customer. [Weltman Cert. ¶24; Exh. H to Weltman Cert.].

52. Neither of these two statements made on the Freightguard Report by Mendlovic were true. [Mendlovic Dep. 79:18-80:20; 169:10-170:1].

53. The only truthful statement in Mr. Mendlovic's response to the Freightguard Report was that he had offered to pay Plaintiff a commission on the revenue Defendant received from Furmano. [Mendlovic Dep. 92:21-93:16; 142:8-17; 162:3-15].

54. Pursuant to Paragraph 11 of the Contract, Plaintiff is entitled to $10,250.00, based on twenty-five (25%) percent of the $41,000.00 in revenue Defendant received from its work directly with Furmano. [Para. 11 of Exh. B to Weltman Cert.].

55. Pursuant to Paragraph 11 of the Contract, Plaintiff is also entitled to damages. [Para. 11 of Exh. B to Weltman Cert.].