EXPRESS FREIGHT SYSTEMS INC.,

*Plaintiff,*

- against -

YMB ENTERPRISES INC.,[1]

*Defendant.*

Case: 1:20-cv-00186-ARR-LB

---

# DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION

Levi Huebner & Associates PC
*Attorneys for Defendants*
488 Empire Boulevard, Suite 100
Brooklyn, NY 11225

---

[1] The caption conforms to the Court's Order, dated April 20, 2020 (ECF 45).

# Table of Contents

DEFENDANTS' MEMORANDUM FOR DISMISSAL OF THE ACTION ..........1

QUESTIONS PRESENTED.....................................................................................2

STATEMENT OF FACTS ......................................................................................3

    The Facts that Impeach the Complaint ...........................................................13

    Procedural History .........................................................................................15

ARGUMENTS.......................................................................................................19

    I. PLAINTIFF CANNOT SHOW A LEGITIMATE INTEREST FOR
        RESTRAINING DEFENDANT WITH RESPECT TO FURMANO
        AND THE CLAIM MUST BE DISMISSED. ....................................20

    II. THE CONTRACT CLAUSE THAT RESTRAINS A PARTY FROM
        DOING DIRECT BUSINESS WITH ITS OWN CUSTOMER IS VOID
        AS CONTRARY TO PUBLIC POLICY BEING AN OVERBROAD
        RESTRICTION. ................................................................................25

    III.   THE PLAINTIFF CANNOT SHOW THAT ITS RELATIONSHIP
        WITH FURMANO HAS A LEGIT PROTECTIBLE INTEREST OF
        INFORMATION THAT GO BEYOND THE MERE IDENTITY
        OF CUSTOMERS OR GENERAL SKILLS LEARNED IN THE
        TRADE.............................................................................................28

    IV.   THE ABSENCE OF ADEQUATE PERFORMANCE OF THE
        CONTRACT BY PLAINTIFF WARRANTS DENIAL OF
        PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
        ENTERING JUDGMENT DISMISSING THIS ACTION. .................29

    V. THE PLAINTIFF CANNOT SHOW THAT DEFENDANT USED
        PLAINTIFF'S FREIGHT RATES AT A TIME WHEN ALL THE
        RATES EMPLOYED BY DEFENDANT WERE SUBJECT TO THE
        GUIDANCE OF PREVAILING MARKET RATES THAT RISE AND
        FALL FREQUENTLY.......................................................................33

    VI.   THE PLAINTIFF CANNOT SHOW DAMAGES CAUSED IN 2018
        FOR LOSING BUSINESS WHILE STILL DOING BUSINESS WITH

             FURMANO AND GENERATING MORE REVENUES IN 2018 THAN THE PRIOR YEARS ............................................................34

VII.   THE PLAINTIFF CANNOT PROVE ANY LOSS OF BUSINESS WHEN THE FACTS SHOW THAT THE DEFENDANT'S ACTION DID NOT CAUSE FURMANO TO DO BUSINESS WITH CLASS LOGISTICS ..................................................................................36

VIII. THE COURT LACKS DIVERSITY JURISDICTION WHEN THE PLAINTIFF'S CLAIM FOR DAMAGES OF LOSING FURMANO AS A CUSTOMER WAS NOT TRUE ON THE DAY THE COMPLAINT WAS FILED. ........................................................................................37

CONCLUSION ..........................................................................................42

## Table of Authorities

**Cases**

*Adecco USA, Inc. v. Staffworks, Inc.*, No. 620CV744MADTWD,
   2020 WL 7028872 (N.D.N.Y. Sept. 15, 2020) .....................................13

*Am. Inst. of Chem. Eng'rs v. Reber-Friel Co.*,
   682 F.2d 382 (2d Cir. 1982) .................................................................13

*Anders v. Verizon Commc'ns Inc.*,
   No. 16-CV-5654 (VSB), 2018 WL 2727883 (S.D.N.Y. June 5, 2018) ...............12

*BDO Seidman v. Hirshberg*,
   93 N.Y.2d 382, 712 N.E.2d 1220 (1999) ............................................19

*Beard v. Banks*,
   548 U.S. 521, 529, 126 S. Ct. 2572, 2578, 165 L. Ed. 2d 697 (2006) ................11

*Credit Suisse First Boston v. Utrecht-Am. Fin. Co.*,
   80 A.D.3d 485 (1st Dep't 2011) ........................................................16

*Flatiron Health, Inc. v. Carson*,
   No. 19 CIV. 8999 (VM), 2020 WL 1320867 (S.D.N.Y. Mar. 20, 2020) ...........18

*IVDV Assocs. Inc. v. Seruya*,
   No. 17-CV-1009-SJB, 2020 WL 1501857 (E.D.N.Y. Mar. 24, 2020) ................20

*Loughlin v. Meghji,*
  186 A.D.3d 1633, 132 N.Y.S.3d 65 (2020) ..................................... 12, 14, 26, 30

*Lussoro v. Ocean Fin. Fed. Credit Union,*
  456 F. Supp. 3d 474 (E.D.N.Y. 2020) ........................................... 1, 12

*Meisels v. Meisels,*
  No. 19-CV-4767(EK)(RML), 2021 WL 1924186, (E.D.N.Y. May 13, 2021) ...16

*Optima Media Grp. Ltd. v. Bloomberg L.P.,*
  No. 17-CV-01898 (AJN), 2021 WL 1941878 (S.D.N.Y. May 14, 2021) .... 20, 23

*Sauer v. Xerox Corp.,*
  5 F. App'x 52 (2d Cir. 2001) ................................................. 12

*Sauer v. Xerox Corp.,*
  95 F. Supp. 2d 125 (W.D.N.Y. 2000) ........................................... 12

*Tongkook Am., Inc. v. Shipton Sportswear Co.,*
  14 F.3d 781 (2d Cir. 1994) ................................................... 28

*United States v. Barrow,*
  400 F.3d 109 (2d Cir. 2005) .................................................. 16

*Wolde-Meskel v. Vocational Instruction Project Cmty. Servs., Inc.,*
  166 F.3d 59 (2d Cir. 1999) ................................................ 1, 27

**Statutes**

N.Y. Gen. Bus. Law § 340 ....................................................... 14

**Other Authorities**

Restatement [Second] of Contracts § 188 ........................................ 19

**Rules**

Fed. Rule Civ. Proc. 56(c) ..................................................... 11

1. This case has come before the Court on an allegation of a breach of contract upon diversity jurisdiction. The elements for such claim in New York are (1) the existence of an agreement, (2) adequate performance of the contract by plaintiff, (3) breach of the contract by defendant, and (4) damages. *Lussoro v. Ocean Fin. Fed. Credit Union*, 456 F. Supp. 3d 474, 482 (E.D.N.Y. 2020).

2. This memorandum is submitted by YMB Enterprises Inc. ("defendant") in opposition to the motion for summary judgment of Express Freight Systems Inc. ("plaintiff"). Given that plaintiff is short with at least one or more element to prove a breach of contract, this action should be dismissed with prejudice.

3. Plaintiff erroneously looks for a judgment against defendant over the mental process of Furmano. Plaintiff and Furmano Foods Inc ("Furmano") teamed up to hold defendant liable over the mental process of Furmano. This type of self-serving justice is contrary the equity and law that this Court follows.

4. An additional ground for dismissal, which became obvious through discovery, at the time the complaint was filed plaintiff made a bad faith attempt to feign jurisdiction by exaggerating the plight of damages when the purported damage of losing business did not exist.See *Wolde-Meskel v. Vocational Instruction Project Cmty. Servs., Inc.*, 166 F.3d 59, 63 (2d Cir. 1999). In fact, the purported claim is at best $10,250 for purportedly violating a non-solicitation clause, far short of the diversity threshold. To cross the diversity threshold, plaintiff's complaint alleged

that it suffered severe damages by losing Furmano Foods Inc. ("Furmano") as a customer. Discovery revealed that Furmano continues being plaintiff's customer and that Furmano never ceased being plaintiff's customer; a material fact that was present on the day the complaint was filed.

## QUESTIONS PRESENTED

     i.    Whether a covenant of restraint that is beyond the performance of offering and tendering business to defendant is null and void as against public policy?

    ii.    Whether a contract clause that restrains a party from doing direct business with its own customer is void as contrary to public policy for being an overbroad restriction?

    iii.    Whether the plaintiff has a legitimate protectible interest of information that is beyond the mere identity of Furmano?

    iv.    Whether the absence of adequate performance of the contract by plaintiff warrants denial of Plaintiff's motion for summary judgment and entering judgment dismissing this action?

    v.    Whether the plaintiff can claim that defendant used plaintiff's freight rates at a time when the rates employed by the parties were subject to the prevailing market that rises and falls every other day?

vi.     Whether the plaintiff can claim damages for losing business in 2018 while still doing business with Furmano and generating more revenues in 2018 than the prior years?

vii.    Whether the plaintiff can show it lost Furmano as a customer when the facts show that the plaintiff never lost Furmano as a customer and has received their support throughout this action?

viii.   Whether the plaintiff can attribute the loss of business when the facts show that the defendant's action did not cause Furmano to do business with Class Logistics?

ix.     Whether the Court lacks diversity jurisdiction when the Plaintiff's claim for damages of losing Furmano as a customer was not true on the day the complaint was filed?

## STATEMENT OF FACTS

5.      Express Freight Systems Inc. ("plaintiff") is a freight broker. (Affirmation by Huebner Exhibit A ¶ 14). YMB Enterprises Inc. ("defendant") is a freight carrier. (Affirmation by Huebner Exhibit A ¶ 14).

6.      Starting in 2017 until late-2019, Defendant had a steady route transporting goods from New York City (NYC) to a facility in Northumberland, PA. During that time, defendant had at least three to six (6) shipments per day, with a

minimum of fifteen (15) dispatches per week, totaling at least sixty (60) to one hundred (100) dispatches per month, all heading to Northumberland, PA. (Affirmation by Huebner Exhibit A ¶ 7).

7.    In order to defray the cost of driving empty fleet back to NYC, defendant sought freight en route from Northumberland, PA to NYC. Defendant had no interest in pursuing other routes, such as freight heading to Philadelphia (i95) or Harrisburg (I-78) or even Bridgeport Connecticut, given that other routes deviate at least two hours from the route to New York City. (Affirmation by Huebner Exhibit A ¶ 8).

8.    At all relevant times, defendant concentrated on finding freight leaving Northumberland east on Interstate I-80. The only mission was to reduce the costs of driving empty fleet from Northumberland back to New York City. Defendant was neither interested in competing with or commandeering the freight market in Northumberland but was strictly concentrated as a market participant in reducing the costs of driving empty vehicles back to New York City. (Affirmation by Huebner Exhibit A ¶ 8).

9.    Volvie Mendlovic ("Volvie"), was an employee for defendant, whose job was looking for known shippers that are in Northumberland with a target market in New York City. Starting early 2018, YMB was in negotiations with Arye Krausz ("Krausz") to purchase Prominent Logistics and MK Freight. Krausz as an

experienced freight broker offered many leads to YMB in finding freight near Northumberland, including by recommending Furmano Foods ("Furmano") as a known shipper located in Northumberland with a strong customer base in New York City. (Affirmation by Huebner Exhibit A ¶ 1, 8, 9).

10.  Krausz recommended that YMB obtain a subscription with DAT.com just for that purpose. Krausz also recommended to YMB that Furmano is inconsistent with retaining brokers and carriers, and that YMB would have to routinely pursue various leads to maintain a sufficient stream of freight from Furmano. (Affirmation by Huebner Exhibit A ¶ 9).

11.  DAT.com is a website offering a marketplace where brokers and carriers meet. DAT.com has a system that monitors the freight prices of participating users and consequently monitors the prices for freight leaving Northumberland heading towards Flushing NY and Brooklyn NY. (Affirmation by Huebner Exhibit A ¶ 11)

12.  In early June 2018, defendant met Suntec Transport Co Inc. ("Suntec") on DAT.com and began servicing Furmano through Suntec, who from June 22, 2018, through July 24, 2018, offered defendant only five (5) dispatches. The receipt of only five (5) dispatches a month was a deficit for defendant in curing deficits of traveling to NYC with empty vehicles. As a direct result, defendant continued

seeking other leads offering freight from Furmano. (Affirmation by Huebner, Exhibits A¶ 12, B and C).

13. At the same time, on or about June 17, 2018, Furmano began offering most dispatches through an unrelated broker known as "Class Logistics." Defendant meanwhile was unaware that Class Logistics outdid other brokers and carriers from Furmano until defending this case. (Affirmation by Huebner, Exhibit D ¶ 9).

14. Meanwhile, plaintiff was going through a similar pinch; in June-July 2018, plaintiff received fewer dispatches from Furmano. In response, Plaintiff posted on DAT.com looking for carriers willing to serve Northumberland. Plaintiff's goal was to curtail other carriers from reaching Furmano. (Certification by Rodney Weltman ¶ 9, 20).

1. On July 26, 2018, defendant responded to a listing from plaintiff, seeking to haul freight from Northumberland to NYC. Plaintiff offered defendant a contract which in paragraph 3 states: that plaintiff agrees to offer and tender freight to defendant subject to the availability of suitable equipment (fleet). (Affirmation by Huebner Exhibit A ¶¶ 15, 16 and Exhibit E).

15. Paragraph 4 of the contract states that defendant agrees to transport freight for plaintiff "in accordance with the rates set forth in Schedule 'A' attached hereto and made part hereof." Meanwhile, there never was a Schedule A. On July 26, 2018, when sending the contract to defendant for signature, plaintiff did not

6

attach a Schedule 'A'. Much time passed after July 26, 2018, including discovery in this litigation, yet plaintiff did not produce the purported "Schedule 'A'". (Affirmation by Huebner, Exhibits A ¶ 18 and E).

16.     Paragraph 5 in the contract provided that the parties "agree that transportation service hereunder are to be performed as a contract earner in compliance with 49 U.S.C. 10102." The policy behind 49 U.S.C. 10102 is delineated in 49 U.S.C. 10101 to allow competition, to the maximum extent possible, for reasonable rates and to avoid undue concentrations of market power. (Affirmation by Huebner Exhibits A and E, 49 U.S.C. §§ 10101, 10102).

17.     Paragraph 11 of the contract provides, "CARRIER agrees to support and protect BROKER'S effort in performance of this agreement by refraining from ANY direct contact or solicitation of BROKER'S customers.... CARRIERS shall not directly or indirectly solicit or do business of a transportation or warehouse nature with any of BROKER'S customers who are serviced by CARRIER as a result of this agreement unless otherwise agreed to in writing." The contract does not define the term "broker's customers." (Affirmation by Huebner, Exhibit E).

18.     As delineated in Paragraph 3 of the contract, the plaintiff's efforts in performance of this agreement required offering and tendering freight to defendant subject to the availability of defendant's suitable equipment (fleet). (Affirmation by Huebner Exhibit E).

19.    At all relevant times, defendant had suitable equipment in Northumberland, ready and willing to carry a minimum of sixty (60) to one hundred (100) loads per month heading to NYC satisfying paragraph 3 of the contract. Meanwhile, between July 26, 2018 and September 12, 2018, plaintiff had at least seventeen (17) dispatches leaving Furmano and offered defendant only one (1) single dispatch. (Affirmation by Huebner Exhibit A ¶ 16, 17, Exhibit E and F p. 5))

20.    Not much different, from September 13, 2018 through October 16, 2018, plaintiff had at least sixteen (16) dispatches leaving Furmano's and plaintiff offered defendant only six (6) dispatches. At the same time, between September 13, 2018 and October 16, 2018, defendant had its equipment in Northumberland ready and willing to service all sixteen (16) dispatches. (Affirmation by Huebner, Exhibits A ¶ 19, E, F, G, and H[2])

21.    During this period, between July 26, 2018 and October 16, 2018, defendant was unaware that plaintiff chose to offer twenty-nine (29) dispatches from Furmano to other carriers. Plaintiff did not disclose any specific reason as to why plaintiff would offer defendant only seven (7) out of thirty-six (36) dispatches. (Affirmation by Huebner, Exhibits A ¶ 21, E, F, G, and H)

---

[2] A review of the invoices in Exhibit F and the table of dispatches in Exhibit G found dispatches missing. Exhibit H to the Affirmation by Huebner is a table culled from both records to calibrate the dispatches.

8

22.    Meanwhile, defendant was under the impression that Furmano is not satisfied with the services provided by plaintiff. Defendant also learned from other brokers that Furmano has a habit of interspersing multiple brokers and carriers irregularly and this statement was corroborated by Furmano in an affidavit. (Affirmation by Huebner Exhibit A ¶ 21).

23.    Came October 5, 2018, after one of the dispatches that defendant serviced for Suntec, defendant received a message from Furmano to contact them. Defendant was under the impression that Furmano had an incident with one of its drivers. Volvie responded to Furmano. Thereafter, a representative of Furmano informed Volvie that Furmano no longer plans to offer its freight through plaintiff. Defendant feared that if they do not accept freight directly from Furmano they would lose the route. Defendant could not afford losing the route. As a direct result, starting October 18, 2018, Defendant serviced Furmano without an intermediary broker. (Affirmation by Huebner Exhibit A ¶ 22)

24.    Meanwhile, Furmano states in its affidavit that on October 11, 2018, it informed plaintiff that Class Logistics and defendant had outbid plaintiff. (Affirmation by Huebner, Exhibit D ¶ 9 and F).

25.    Despite knowing that Furmano has been providing dispatches to other brokers, such as a Class Logistics, plaintiff made no effort to lower its rate to Furmano. (Affirmation by Huebner Exhibit F).

26.     In the following days, on October 19 and 22 of 2018, plaintiff offered defendant the last two (2) dispatches, bringing their total dispatches starting from July 26, 2018 to nine (9) dispatches. From then on, the dispatches between plaintiff and defendant went dead. As it turns out, between October 17, 2018 and December 31, 2018, plaintiff received twenty-two (22) dispatches from Furmano, and only offered defendant two (2) of those dispatches. On December 17, 2018, defendant stopped accepting freight directly from Furmano and continued servicing Furmano through other brokers. (Affirmation by Huebner, Exhibits A ¶ 23, 24 and Exhibit and F).

27.     Furmano never ceased being plaintiff's customer. (Affirmation by Huebner, Exhibit F)

28.     Between October 18, 2018, through December 31, 2018, Express serviced Furmano with at least twenty-two (22) dispatches. Further, in 2019 plaintiff received at least seventy-seven (77) dispatches from Furmano and in 2020 Plaintiff received from Furmano at least 134 dispatches. (Affirmation by Huebner, Exhibit and F)

29.     Furmano is assisting plaintiff in bringing this case. (Affirmation by Huebner, Exhibit D)

30.    At all relevant times, in 2019 and 2020—after Furmano purportedly ceased to be plaintiff's customer—plaintiff continued receiving bids from Furmano. Each bid contained over 200 to 400 dispatches. (Affirmation by Huebner, Exhibits I, J, and L).

31.    The reasons that plaintiff did not win all those bids has nothing to do with defendant. What is relevant, plaintiff did not produce any evidence in discovery showing that they responded to those bids with an offer and thus there is an inference that plaintiff did not compete for Furmano's business. Indeed, in September 2019, Furmano complained to plaintiff that they "never received any published rates from you [plaintiff]". In a responsive email, Furmano rejected the offers advanced by plaintiff as "Neither of those two will work." (Affirmation by Huebner, Exhibits J and K).

32.    In 2019 and 2020, plaintiff fared no less dispatches than it did in 2015 and 2016. (Affirmation by Huebner, Exhibit F p. 7)

33.    In 2018 plaintiff fared a similar rate of dispatches to which it did in 2017. (Affirmation by Huebner, Exhibit F p. 7)

34.    In 2018, the year of the purported breach of contract, plaintiff generated $37,723.25 more than it did in its prior year 2017. (Affirmation by Huebner, Exhibit F p. 18)

35.     In 2019 when the market freight rate began dropping the plaintiff was slow to adapt to the market rates. In other words, the very period that plaintiff claims it suffered damages there were no quantifiable damages. (Affirmation by Huebner, Exhibit F p. 10)

36.     Class Logistics had solicited Furmano for at least $ 100.00 less per load than what plaintiff had been charging. (Affirmation by Huebner, Exhibit D p. 9)

37.     Furmano also has its own trucks and most often do not rely on brokers or third-party carriers. (Affirmation by Huebner, Exhibit M).

38.     Although defendant recorded a payment of $41,000, Defendant only received $39,900 and wrote-off one job of $1,100 as "paid" even though they did not receive an actual payment from Furmano. (Affirmation by Huebner, Exhibits A ¶ 29 and D at sub-exhibit "Vendor Payment History")

39.     Furmano paid defendant only $39,900. (Affirmation by Huebner, Exhibits A ¶ 29 and D at sub-exhibit "Vendor Payment History")

40.     On October 19, 2018, plaintiff misrepresented to defendant that its customer had "chopped" its rate and plaintiff requested the price be adjusted to $1,050, which defendant sympathetically agreed. (Affirmation by Huebner, Exhibit N)

41.     Meanwhile Furmano had not chopped plaintiff's rate and Furmano was billed at the same rate as all prior trips to the same location. (Affirmation by Huebner, Exhibits O and P)

*The Facts that Impeach the Complaint*

42.     Now comes plaintiff who pleads in the complaint "On or about July 26, 2018, Plaintiff and Defendant entered into a written contract dated July 26, 2018, pursuant to which Defendant agreed to transport freight for various customers of Plaintiff based on agreements Plaintiff brokered with such customers" (emphasis added). However, discovery revealed that no "agreements" exist.

43.     The complaint pleads "Defendant was at all times aware of the contractual relationship between Plaintiff and Furmano." (ECF 1 ¶ 19). "Defendant intentionally and maliciously interfered with Plaintiff's contractual relation with Furmano..." (ECF ¶ 20). However, Discovery revealed that no such contracts exist.

44.     The complaint asserts, "As a result of Defendant's underhanded tactics, Furmano has been doing business directly with Defendant and has virtually ceased using Plaintiff' services." (Underline added). However, discovery revealed that this statement is a bald fabrication. Between October 18, 2018, and December 31, 2018, Express serviced Furmano with at least twenty-two (22) dispatches. Further, in 2019 plaintiff received at least seventy-seven (77) dispatches from Furmano and in 2020 Plaintiff received from Furmano at least 134 dispatches. Indeed, plaintiff never lost

13

Furmano as a customer and Furmano is self-servingly, assisting plaintiff in prosecuting this case. (Affirmation by Huebner, Exhibit F p. 7)

45.    The complaint alleges, "Plaintiff has suffered damages in an amount to be determined at trial, but which far exceeds $75,000." However, a review of the discovery by a forensic accountant revealed the following, (i) in 2019 and 2020, plaintiff fared no less dispatches than it did in 2015 and 2016, (ii) in 2018 plaintiff fared a similar rate of dispatches as it did in 2017, (iii) in 2018, the year of the purported breach of contract, plaintiff generated $37,723.25 more than it did in its prior year 2017, and (iv) in 2019 when the market freight rate began dropping the plaintiff was slow to adapt to the market rates. In other words, the very period that plaintiff claims it suffered damages there were no quantifiable damages. (Affirmation by Huebner, Exhibit F p. 6-18)

46.    The complaint alleges "Furmano Foods has been a valued customer of Plaintiff since 2013. During this time, Plaintiff has averaged approximately $15,000.00 in monthly sales through its work for Furmano." Discovery revealed that during the same period, for many months (such as from April through August 2016) plaintiff did not receive any business from Furmano. (Affirmation by Huebner, Exhibit F p. 6-18)

47.    The complaint alleges "During the course of transporting freight for Furmano on a job brokered by Plaintiff, Defendant, solicited Furmano using

14

Plaintiff's confidential and proprietary pricing structure to undercut Plaintiff and steal Furmano away from Plaintiff." Discovery revealed no evidence supporting the proposition that defendant used plaintiff's rates. Defendant used the prevailing market rates to set its own prices. Discovery revealed that plaintiff paid defendant per dispatch starting from $997.50 to $1,100 being the highest rate, while Furmano paid defendant for comparable freight starting at $1,100 to $1,300 being the highest rate. (Affirmation by Huebner, Exhibit A ¶ 25).

*Procedural History*

48. On May 1, 2019, plaintiff filed the complaint in the District of New Jersey. (ECF 1). By that time, plaintiff was already aware that Furmano did not cease to do business with plaintiff.

49. On January 6, 2020, the District Court of New Jersey (Wigenton, *J.*) entered an order transferring this case to the Eastern District of New York. (ECF 28).

50. On April 20, 2020, the Court entered an order, "YMB's primary argument in its motion to dismiss appears to be that it did not breach its contract with Express Freight because Furmano was YMB's customer before it was Express Freight's customer. To advance this argument, YMB has put forward evidence seeking to contradict the facts alleged in the complaint. See Def.'s Br. Ex. B, ECF

15

No. 43-4. YMB is welcome to introduce this evidence and make this argument on a motion for summary judgment or at trial." (ECF 45).

51.   On May 4, 2020, defendant filed its answer (ECF 46).

52.   On January 18, 2021, defendant's 30(b)(6) witness was deposed, wherein during the deposition, defendant demanded that plaintiff furnish a copy of the deposition transcript and copies of the marked exhibits, however, in contravention of Fed. R. Civ. P. 26(a)(3)(B) plaintiff refused to furnish a copy of the deposition transcript and refused to produce the marked exhibits to defendant.

53.   By electronic Order dated January 27, 2021, the Court directed that the parties shall complete all expert discovery by March 12, 2021. Upon completion of discovery, any party seeking to file a dispositive motion shall request a pre-motion conference by April 6, 2021, in accordance with Judge Ross's Individual Motion Practices and Rules.

54.   By electronic Order dated March 17, 2021, the Court directed that all expert discovery shall be completed by May 12, 2021. If defendant secures its own expert, Plaintiff shall have two weeks from the receipt of any expert report to depose the expert. The Court will not look favorably upon any further extension requests. Upon the completion of discovery, any party seeking to file a dispositive motion shall request a pre-motion conference by June 2, 2021.

55. By electronic Order dated May 6, 2021, the Court directed that defendant shall serve its expert report by May 12, 2021, and over objection of defendant that no depositions of expert witnesses shall be conducted at this time.

56. Defendant duly served a hard copy of its expert report upon plaintiff on May 12, 2021.

57. On June 1, 2021, plaintiff filed its letter seeking a pre-motion conference (ECF 72).

58. On June 4, 2021, defendant filed its responsive letter regarding the pre-motion conference (ECF 72).

59. On June 4, 2021, by electronic Order the Court grants plaintiff permission to bring the proposed motion. The court directs that plaintiff's motion shall be briefed as follows: plaintiff's motion and supporting papers shall be served no later than June 18th, 2021; defendant's opposition papers shall be served no later than July 9th, 2021; plaintiff's reply papers, if any, shall be served no later than July 16th, 2021. The fully briefed motion shall be filed in accordance with chambers' rules, including courtesy copies for chambers, no later than July 16th, 2021.

60. On June 18, 2021, in contravention of the Court's directive and its individual rules, plaintiff filed a motion for sanctions [ECF 75].

61.    On June 18, 2021, separately off calendar, in contravention of Rule 5.

(b)(2)(E), without consent of defendant, plaintiff improperly furnished a courtesy

copy of its motion for summary judgment via email. Notably, plaintiff's improper

ECF filing of the sanctions motion along with an email copy of the sanctions motion,

combined with plaintiff's failure to serve hard-copies of its sanctions motion or its

motion for summary judgment caused confusion and prejudice to defendant.

Moreover plaintiff's email copy of its motion for summary judgement, was only

belatedly discovered by defendant.

62.    On June 28, 2021, in part due to plaintiff's failure to properly serve its

motions or furnish copies of the deposition transcript, defendant filed a letter

objecting to plaintiff's improper motion for sanctions (ECF 76).

63.    On June 30, 2021, in response to defendant's letter, by electronic Order

the Court directed that plaintiff's motion for sanctions shall be briefed according to

the same schedule that was set for the pending motion for summary judgment. Thus,

defendant's opposition papers shall be served no later than July 9th, 2021, and

plaintiff's reply papers, if any, shall be served no later than July 16th, 2021. The fully

briefed motion shall be filed in accordance with chambers' rules, including courtesy

copies for chambers, no later than July 16th, 2021.

64.    On July 7, 2021, defendant filed a letter motion requesting an extension

of time (ECF 78).

65. On July 8, 2021, by electronic Order, the Court granted the Motion for Extension of Time to File Response/Reply as to the pending motion for sanctions and motion for summary judgment. The defendant's opposition papers are now due July 23, 2021, and the plaintiff's reply papers, if any, are due July 30, 2021.

66. On July 21, 2021, defendant filed a letter motion requesting an extension of time (ECF 79).

67. On July 22, 2021, by electronic Order, the Court granted the Motion for Extension of Time to File Response/Reply. Defendant's opposition papers are now due July 30, 2021, and the plaintiff's reply papers, if any, are due August 6, 2021.

68. On July 30, 2021, by first class mail, the defendant duly served its opposition to plaintiff's motion for summary judgment.

## **ARGUMENTS**

69. Under standard of Fed. Rule Civ. Proc. 56(a), according to *Beard v. Banks*, 548 U.S. 521, 529 (2006), it is the burden of the movant to demonstrate "the absence of a genuine issue of material fact and his entitlement to judgment as a matter of law." *Id.* Only "**If**" the movant "has done so, then" the court must determine whether nonmovant "bears the burden of persuasion." *Id* (emphasis added).

70.     The elements of a breach of contract claim in New York law are (1) the existence of an agreement, (2) adequate performance of the contract by plaintiff, (3) breach of the contract by defendant, and (4) damages. *Lussoro v. Ocean Fin. Fed. Credit Union,* 456 F. Supp. 3d 474, 482 (E.D.N.Y. 2020). The existence of a valid contract is the most important element in this cause of action. *Anders v. Verizon Commc'ns Inc.,* No. 16-CV-5654 (VSB), 2018 WL 2727883, at *10 (S.D.N.Y. June 5, 2018). When an element of damages is missing, the claim must be dismissed. *Sauer v. Xerox Corp.,* 95 F. Supp. 2d 125, 134 (W.D.N.Y. 2000), *aff'd,* 5 F. App'x 52 (2d Cir. 2001).

## I.     PLAINTIFF CANNOT SHOW A LEGITIMATE INTEREST FOR RESTRAINING DEFENDANT WITH RESPECT TO FURMANO AND THE CLAIM MUST BE DISMISSED.

71.     A covenant against competition must be construed strictly and should not be extended beyond the literal meaning of its terms. *Loughlin v. Meghji,* 186 A.D.3d 1633, 1637–38, 132 N.Y.S.3d 65, 72 (2020). The restraint must be reasonable such that it is no greater than is required for the protection of the legitimate interest of the party seeking enforcement. *Id.* To this extent the interpretation of the contract and its applicable laws is a question of law.

72.     Only after determining that a restrictive covenant would serve to protect against such unfair and illegal conduct and not merely to insulate the employer from

competition, does the reasonableness of the covenant in terms of its time, space or scope, or the oppressiveness of its operation become an issue. *Am. Inst. of Chem. Eng'rs v. Reber-Friel Co.*, 682 F.2d 382, 386-87 (2d Cir. 1982). Thus, the Court must first assess whether the plaintiff has a legitimate business interest necessary to sustain each of the restrictive covenants. *Adecco USA, Inc. v. Staffworks, Inc.*, No. 620CV744MADTWD, 2020 WL 7028872, at *7 (N.D.N.Y. Sept. 15, 2020).

73.    Paragraph 11 of the contract provides, "CARRIER agrees to support and protect BROKER'S effort in performance of this agreement by refraining from ANY direct contact or solicitation of BROKER'S customers.... CARRIERS shall not directly or indirectly solicit or do business of a transportation or warehouse nature with any of BROKER'S customers who are serviced by CARRIER as a result of this agreement ..."

74.    The keyword for the restrictive covenant is to protect plaintiff's "effort in performance of this agreement." The required performance of the agreement is delineated in Paragraph 3 of the contract, the plaintiff will offer and tender freight to defendant subject to defendant's availability of suitable equipment (vehicles).

75.    The following facts are undisputed: defendant entered into the contract with plaintiff on the anticipation of regularly receiving freight from Northumberland heading to NYC. (Affirmation by Huebner, Exhibit A ¶ 27). The parties signed the contract on July 26, 2018. (Affirmation by Huebner, Exhibit E). Defendant had the

21

availability of over sixty (60) fleet per month ready in Northumberland and was willing to deliver freight to NYC. (Affirmation by Huebner, Exhibit A ¶ 7). Over a period of the first eighty-tree (83) days, starting July 26, 2018, up to October 16, 2018, plaintiff had offered twenty-nine (29) dispatches from Furmano to other carriers. (Affirmation by Huebner, Exhibit H). Plaintiff did not disclose any specific reason as to why plaintiff would offer defendant only seven (7) out of thirty-six (36) dispatches. (Affirmation by Huebner, Exhibit A ¶ 27).

76.     It is axiomatic that defendant would have not entered into the contract knowing that plaintiff's effort was to suffocate defendant with a bare bones supply of freight. (Affirmation by Huebner, Exhibit A ¶ 27).

77.     The absence of a legitimate interest for the restraint is obvious. Plaintiff pled in the complaint "On or about July 26, 2018, Plaintiff and Defendant entered into a written contract dated July 26, 2018, pursuant to which Defendant agreed to transport freight for various customers of Plaintiff based on agreements Plaintiff brokered with such customers" (underline added). (ECF 1 ¶ 5). The complaint pleads "Defendant was at all times aware of the contractual relationship between Plaintiff and Furmano." (ECF 1 ¶ 19). "Defendant intentionally and maliciously interfered with Plaintiff's contractual relation with Furmano..." (ECF 1 ¶ 20).   However, discovery revealed that no such contracts or agreements exist.

78.    Now comes the plaintiff who claims that the contract restrained defendant from directly receiving freight from Furmano, albeit the plaintiff did not offer all its dispatches to defendant. Given that under *Loughlin v. Meghji*, 186 A.D.3d 1633, 1637–38, 132 N.Y.S.3d 65, 72 (2020) the plaintiff is attempting to extend the covenant of restraint beyond the literal meaning of the performance of offering and tendering freight to defendant as delineated in Paragraph 3 of the contract, the plaintiff's claim must fail.

79.    Under New York law N.Y. Gen. Bus. Law § 340[1] every contract that its purpose is to establish or maintain a monopoly, restrains competition, or unlawfully interferes with the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state any business, trade or commerce or the furnishing of any service, is illegal and void as against public policy. The plaintiff's claim that the contract restrains defendant, from directly receiving freight from Furmano without plaintiff offering all dispatches to defendant, is an unlawful restraint on competition or the free exercise of an activity of business. The law does not afford plaintiff the luxury of restraining defendant from doing business with a customer without plaintiff having to equally offer something in return. Whatever plaintiff offered defendant was merely a bare bones supply of freight but nothing to justify excluding defendant from doing business with Furmano and causing financial damages to defendant.

80.    Moreover, plaintiff looks to misuse the contract to restrain defendant's access to Furmano without offering defendant anything substantial in return. Here the plaintiff's failure of consideration, the failure to offer and tender to defendant all the dispatches for which the parties bargained, is undisputed. The Court should avoid the interpretation, that plaintiff could restrain defendant without offering any consideration in return, since it renders the contract illusory and therefore unenforceable; the rendering a contract illusory is disfavored and enforcement of a bargain is preferred. *Meisels v. Meisels*, No. 19-CV-4767(EK)(RML), 2021 WL 1924186, at *9 (E.D.N.Y. May 13, 2021) (quoting *Credit Suisse First Boston v. Utrecht-Am. Fin. Co.*, 80 A.D.3d 485, 488-89 (1st Dep't 2011)).

81.    Under *Loughlin* plaintiff must show a legitimate interest for restraining defendant with respect to Furmano and cannot go beyond that legitimate interest. The covenant of restraint cannot go beyond the literal meaning of the performance of offering and tendering freight to defendant subject to defendant's availability of suitable equipment (vehicles) as delineated in Paragraph 3 of the contract. It is on this basis; the plaintiff cannot show a legitimate interest to use the contract to restrain defendant beyond the performance of paragraph 3. As such, the plaintiff's claim must be dismissed as going beyond the plain meaning of the contract.

## II. THE CONTRACT CLAUSE THAT RESTRAINS A PARTY FROM DOING DIRECT BUSINESS WITH ITS OWN CUSTOMER IS VOID AS CONTRARY TO PUBLIC POLICY BEING AN OVERBROAD RESTRICTION.

82.   The interpretation of a contract is generally a question of law. *United States v. Barrow*, 400 F.3d 109, 117 (2d Cir. 2005).

83.   Here, the plaintiff interprets the covenant of restraint to sweep too broadly to be enforced as written. Plaintiff stretches the contract beyond its words to declare that once defendant signed the contract, defendant was also precluded from doing any business with customers defendant knew beforehand. Plaintiff looks to stretch the contract to declare that whatever knowledge defendant may have gained from experience prior to entering the contract with Plaintiff, that once it contracted with Plaintiff, defendant was not allowed to work directly for Furmano.

84.   The following facts are undisputed: at all relevant times defendant was only looking for freight leaving Northumberland towards NYC. (Affirmation by Huebner, Exhibit A ¶ 8). Defendant responded to plaintiff's posting on DAT.com only because plaintiff offered freight leaving Northumberland. (Affirmation by Huebner, Exhibit F p. 15, Certification by Rodney Weltman ¶ 9). At the time when responding to the posting and during the first contact between plaintiff and defendant, defendant was already well acquainted with Furmano. (Affirmation by Huebner, Exhibit A¶ 15, 28). Indeed, defendant had served Furmano as the carrier

for Suntec. Furmano on its end had a history of repeatedly interspersing multiple brokers and carriers. (Affirmation by Huebner, Exhibit A ¶ 10, 12, 28, Certification by Chip Stuckey ¶ 12). Had the posting not mentioned Northumberland, which defendant knew is Furmano, defendant would have never met plaintiff. (Affirmation by Huebner, Exhibit A ¶ 28). If Furmano did not have an extensive history of interspersing multiple brokers and carriers, defendant would have had no need to pursue multiple brokers for freight from Furmano. (Affirmation by Huebner, Exhibit A ¶ 28).

85.      Plaintiff's claim as applied cannot survive the fact that anti-competitive covenants do not apply to knowledge gained outside the business relationship with the party seeking the restraint. "This non-solicitation clause is also overbroad because, for example, it makes no distinction between those customers with whom Carson developed a relationship by virtue of his work for Flatiron and those with whom he did not." *Flatiron Health, Inc. v. Carson*, No. 19 CIV. 8999 (VM), 2020 WL 1320867, at *23 (S.D.N.Y. Mar. 20, 2020). As *Flatiron* explained, "an employer does not have a legitimate interest in the preservation of its entire client base where, as here, there is no evidence that the employee obtained a competitive advantage by using confidential information." *Id.* "Accordingly, the non-solicitation clause is 'greater than is needed to protect [Flatiron's] legitimate interests' insofar as it prohibits Carson from soliciting Flatiron customers with whom he did not

develop a relationship through 'assignments to perform direct, substantive ... services' on behalf of Flatiron." *Id.*

86.     The undisputed facts show that Furmano on its end was repeatedly interspersing multiple brokers and carriers, while defendant was pursuing as a market participant any lead offering freight from Furmano. Plaintiff has offered no evidence or legal basis to assert exclusivity with Furmano or some competitive advantage over receiving dispatches with Furmano. Rather the record is clear, that Furmano would choose brokers and carriers at its own pleasing ("Furmano has always worked with a number of different brokers to arrange for the transportation of freight at any given time, including during the period it had been working with Express Freight, and this practice continues presently. In fact, Furmano will, at times, try out new brokers and drop others."). (Affirmation by Huebner, Exhibit D ¶ 12). There simply is no knowledge or unfair advantage that defendant gained directly from plaintiff with regards to Furmano.

87.     "Extending the anti-competitive covenant to BDO's clients with whom a relationship with defendant did not develop through assignments to perform direct, substantive accounting services would, therefore, violate the first prong of the common-law rule: it would constitute a restraint 'greater than is needed to protect' these legitimate interests." *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 392, 712 N.E.2d 1220, 1225 (1999) quoting Restatement [Second] of Contracts § 188(1)(a).

88.    Likewise, here. Defendant had a prior relationship with Furmano before

entering contract with plaintiff, regardless of whether the relationship was direct or

indirect. By the time defendant came to know plaintiff, defendant was already

acquainted with Furmano's habit of dropping brokers and carriers for no cause.

Plaintiff cannot show that defendant gained knowledge of Furmano through

plaintiff. The wrongful interpretation of the contract clause advanced by plaintiff

restrains a party from doing direct business with its own customer and does not

distinguish between customers gained through plaintiff and those gained from other

sources. As such, plaintiff's interpretation of the restrain is void as contrary to public

policy being an overbroad restriction to even prohibit defendant from doing business

with customers it was acquainted.


**III.    THE PLAINTIFF CANNOT SHOW THAT ITS RELATIONSHIP WITH FURMANO HAS A LEGIT PROTECTIBLE INTEREST OF INFORMATION THAT GO BEYOND THE MERE IDENTITY OF CUSTOMERS OR    GENERAL    SKILLS LEARNED IN THE TRADE.**

89.    Although a relationship with customers is a legitimately protectible

interest the information must go beyond the mere identity of customers or general

skills learned in the trade. *IVDV Assocs. Inc. v. Seruya*, No. 17-CV-1009-SJB, 2020

WL 1501857, at *12 (E.D.N.Y. Mar. 24, 2020) (summary judgment was denied on

the enforceability of covenant of restraint because plaintiff did not put forward sufficient evidence regarding customer information allegedly taken).

90. The plaintiff cannot show that its relationship with Furmano has a legitimate protectible interest of information that go beyond the mere identity of customers or general skills learned in the trade. The undisputed facts shows that defendant was already acquainted with Furmano by the time of meeting plaintiff; thus, plaintiff cannot show any customer information that was allegedly taken. As such, plaintiff did not establish a basis for its overbroad restriction restraining a party from doing business with its own customer. The complaint should be dismissed.

## IV. THE ABSENCE OF ADEQUATE PERFORMANCE OF THE CONTRACT BY PLAINTIFF WARRANTS DENIAL OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND ENTERING JUDGMENT DISMISSING THIS ACTION.

91. In order to recover for breach of contract, a party must first show it substantially performed under that contract. *Optima Media Grp. Ltd. v. Bloomberg L.P.*, No. 17-CV-01898 (AJN), 2021 WL 1941878, at *8 (S.D.N.Y. May 14, 2021). A party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach. *Id.* Whether plaintiff substantially performed under the Agreement is a question of fact, for the factfinder based on the evidence presented at trial. *Id.* To decide whether plaintiff substantially performed under New

York law, the Court must decide whether plaintiff's failures to preform go to the root of the agreement with defendant and are so substantial that it defeats the object of the parties in making the contract. *Id.* The Court looks to factors such as the magnitude of default, its effect on the contract's purpose, the willfulness of the breach, and the degree to which the injured party has benefitted under the contract. *Id.*

92.    Paragraph 3 of the contract states "BROKER agrees to <u>offer</u> for shipment and CARRIER agrees to transport on its own equipment ... as Broker may <u>tender</u> subject to the availability of suitable equipment." (Emphasis added). Whether plaintiff, as the broker, preformed as required by the contract, is under *Optima* a question of fact.

2.    The following facts are undisputed: defendant entered the contract with plaintiff on the anticipation of regularly receiving freight in Northumberland heading to NYC. (Affirmation by Huebner, Exhibit A ¶ 27). Plaintiff drafted and presented the contract. (Certification by Weltman ¶15). The parties signed the contract on July 26, 2018. The reason the defendant agreed to the contract is the fact that it looked to reduce the heavy costs of driving its empty fleet from Northumberland to NYC. (Affirmation by Huebner Exhibit A ¶ 8). At all relevant times, defendant had the availability of over sixty (60) fleets per month ready and willing and able to deliver freight to NYC. (Affirmation by Huebner,

Exhibit A ¶ 7). Over a period of the first eighty-three (83) days, starting July 26, 2018, up to October 16, 2018, plaintiff had offered twenty-nine (29) out of thirty-six (36) dispatches from Furmano to other carriers. Plaintiff did not and cannot show any good cause as to why plaintiff limited defendant to only seven (7) dispatches. (Affirmation by Huebner, Exhibit H).

93.     These undisputed facts show plaintiff's lack of a good faith effort in performance of this agreement, at a time when defendant was ready, willing and able to perform fulfilling all thirty-six (36) dispatches. Plaintiff cannot claim that the contract meant something else, because "Ambiguities in a contract are generally construed against the drafter." *AKF, Inc. v. Kessman Grp. Painting & Designs, Inc.*, No. 1:19-CV-6312-FB-LB, 2021 WL 178867, at *5 (E.D.N.Y. Jan. 19, 2021) (quoting *RLS Assocs. LLC v. United Bank of Kuwait PLC*, 380 F.3d 704, 712 (2d Cir. 2004)). It is axiomatic that defendant would have not entered the contract knowing that plaintiff's effort was to suffocate defendant with a bare bone offer of freight.

94.     But most fatal to plaintiff is the plain language of the contract, paragraph 11 provides "CARRIER agrees to support and protect BROKER'S effort in performance of this agreement by refraining from ANY direct contact or solicitation of BROKER'S customers." The plaintiff must first show that its performance of the agreement or attempt of performance it in order to claim that the

direct contact or solicitation of the customer hampered that effort. Given the undisputed record that plaintiff had offered to other carriers twenty-nine (29) out of the first thirty-six (36) dispatches from Furmano, prior to the date of the purported breach of contract, plaintiff cannot show a genuine performance of the contract. In plain and simple words, plaintiff did not broker with Furmano to obtain a benefit from which defendant would benefit as the carrier, as plaintiff misrepresented in the complaint ("Defendant agreed to transport freight for various customers of Plaintiff based on agreements Plaintiff brokered with such customers" (ECF 1), rather plaintiff brokered freight with Furmano to leave defendant hanging with a naked contract without its material benefits.

95. In light of these circumstances, given that plaintiff has substantially failed to perform its side of the bargain of the contract, under *Optima Media Grp. Ltd. v. Bloomberg L.P.,* No. 17-CV-01898 (AJN), 2021 WL 1941878, at *8 (S.D.N.Y. May 14, 2021) the defendant's purported breach of contract is excused, and the complaint must be dismissed.

## V. THE PLAINTIFF CANNOT SHOW THAT DEFENDANT USED PLAINTIFF'S FREIGHT RATES AT A TIME WHEN ALL THE RATES EMPLOYED BY DEFENDANT WERE SUBJECT TO THE GUIDANCE OF PREVAILING MARKET RATES THAT RISE AND FALL FREQUENTLY.

96.    The complaint guesses "During the course of transporting freight for Furmano on a job brokered by Plaintiff, Defendant, solicited Furmano using Plaintiff's confidential and proprietary pricing structure to undercut Plaintiff and steal Furmano away from Plaintiff." Discovery revealed no evidence supporting the proposition that the defendant used plaintiff's pricing structure.

3.    The following are undisputed facts. Paragraph 4 of the contract states that defendant agrees to transport freight for plaintiff "in accordance with the rates set forth in Schedule 'A' attached hereto and made part hereof." (Affirmation by Huebner, Exhibit E). Meanwhile, there never was a Schedule A. On July 26, 2018, when sending the contract to defendant for signature, plaintiff did not attach the purported Schedule 'A'. Much time passed after July 26, 2018, including discovery in this litigation, yet, plaintiff did not produce the purported "Schedule 'A'". (Affirmation by Huebner, Exhibits A ¶ 18 and E).  In addition, by the time defendant came to meet plaintiff, defendant was already well acquainted with the pricing Furmano pays and how they "drop" brokers and carriers for no cause. (Affirmation by Huebner, Exhibit A¶ 15, 28)

4.     Discovery also revealed that plaintiff paid defendant per dispatch starting from $997.50 to $1,100 being the highest rate, while Furmano paid defendant for comparable freight starting at $1,100 to $1,300 being the highest rate. (Affirmation by Huebner, Exhibit A ¶ 25). In other words, the rates defendant charged Furmano were significantly higher than the rates charged to plaintiff. Regardless, the rates defendant would accept for freight were based on the prevailing market rate and the price for each individual load was negotiated separately. (Affirmation by Huebner, Exhibit A ¶ 25). Plaintiff has not produced any evidence tending to the proposition defendant knew the rates that plaintiff was charging Furmano, or that defendant calculated its rates based on plaintiff's rates, or revealed to Furmano the rates that plaintiff paid defendant. As such, the claim that defendant used plaintiff's pricing structure is unsubstantiated and should be dismissed.

### VI.   THE PLAINTIFF CANNOT SHOW DAMAGES CAUSED IN 2018 FOR LOSING BUSINESS WHILE STILL DOING BUSINESS WITH FURMANO AND GENERATING MORE REVENUES IN 2018 THAN THE PRIOR YEARS

97.    The complaint asserts, "As a result of Defendant's underhanded tactics, Furmano has been doing business directly with Defendant and has virtually ceased using Plaintiff' services." (Underline added) (ECF 1 ¶ 13). "Plaintiff has suffered damages in an amount to be determined at trial, but which far exceeds $75,000." (ECF 1 ¶ 16).

98.     However, discovery revealed that these statements are false and Furmano never ceased being plaintiff's customer. (Affirmation by Huebner, Exhibit F). Between October 18, 2018, through December 31, 2018, Express serviced Furmano with at least twenty-two (22) dispatches. (Affirmation by Huebner, Exhibits A ¶ 24 and F). Further, in 2019 plaintiff received at least seventy-seven (77) dispatches from Furmano and in 2020 Plaintiff received from Furmano at least 134 dispatches. (Affirmation by Huebner, Exhibit and F p. 7). Indeed, plaintiff never lost Furmano as a customer and Furmano assisted plaintiff in bringing this case. (Affirmation by Huebner, Exhibit and D)

99.     The following facts are undisputed. Plaintiff submitted an affidavit by Furmano in support of its claim. Furmano on its end went on to discuss and provide evidence and information regarding the defendant so that plaintiff can bolster its claim. (Affirmation by Huebner, Exhibit and D). At all relevant times, in 2019 and 2020—after Furmano purportedly ceased to be plaintiff's customer—plaintiff continued receiving bids from Furmano. Each bid contained over 200 to 400 dispatches. (Affirmation by Huebner, Exhibits I, J, and L). The reasons that plaintiff did not win all those bids has nothing to do with defendant, plaintiff did not compete for those bids. (Affirmation by Huebner, Exhibits J and K). What is relevant, plaintiff did not produce any evidence in discovery showing that plaintiff responded

to those bids with an offer and thus there is an inference that plaintiff did not compete for Furmano's business.

100.    Moreover, a review of the discovery by a forensic accountant revealed the following, (i) in 2019 and 2020, plaintiff fared no less dispatches then it did in 2015 and 2016 (Affirmation by Huebner, Exhibit F p. 7-8), (ii) in 2018 plaintiff fared a similar rate of dispatches to which it did in 2017 (Affirmation by Huebner, Exhibit F p. 7), (iii) in 2018, the year of the purported breach of contract, plaintiff generated $37,723.25 more than it did in its prior year 2017 (Affirmation by Huebner, Exhibit F p. 18), and (iv) in 2019 when the market freight rate began dropping the plaintiff was slow to adapt to the market rates (Affirmation by Huebner, Exhibit F p. 10). In other words, the very period that plaintiff claims it suffered damages there were no quantifiable damages.

## VII.    THE PLAINTIFF CANNOT PROVE ANY LOSS OF BUSINESS WHEN THE FACTS SHOW THAT THE DEFENDANT'S ACTION DID NOT CAUSE FURMANO TO DO BUSINESS WITH CLASS LOGISTICS

101.    The proper measure of damages for breach of a covenant not to compete is the lost profits of which the plaintiff was deprived by reason of the defendant's improper competition. *Loughlin v. Meghji*, 186 A.D.3d 1633, 1638, 132 N.Y.S.3d 65, 72 (2020). A plaintiff has the burden of proving net lost profits due to the

defendant's competition. *Id.* Anticipated lost profits cannot be based on speculation. *Id.*

102. The plaintiff asserts in the complaint that because of defendant Furmano ceased doing business with plaintiff. Meanwhile, prior to the purported breach of contract, Class Logistics had solicited Furmano for at least $ 100.00 less per load than what plaintiff had been charging. Under these circumstances, plaintiff's purported damages are being attributed to defendant based on speculation. See plaintiff Economic Loss Report. (Affirmation by Huebner, Exhibit Q). In other words, if the purported breach of contract did not happen, plaintiff cannot show that the purported loss of business would have not happened, since Furmano was already doing business with Class Logistics at a rate far lower than what plaintiff charged. As such, plaintiff has not set of facts to show that whatever amount of profits it lost can be directly attributed to defendant. Thus, the complaint should be dismissed.

## VIII. THE COURT LACKS DIVERSITY JURISDICTION WHEN THE PLAINTIFF'S CLAIM FOR DAMAGES OF LOSING FURMANO AS A CUSTOMER WAS NOT TRUE ON THE DAY THE COMPLAINT WAS FILED.

103. Satisfaction of the § 1332(a) diversity requirements (amount in controversy and citizenship) is determined as of the date that suit is filed—the time-of-filing rule. *Wolde-Meskel v. Vocational Instruction Project Cmty. Servs., Inc.,* 166 F.3d 59, 62 (2d Cir. 1999). Events occurring subsequent to the institution of suit

37

which reduce the amount recoverable below the statutory limit do not oust jurisdiction. *Id.* This Court recognizes a rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy. *Id.* However, there is no diversity jurisdiction when an argument presents, or a finding is made, that the jurisdictional allegations of the complaint were made in bad faith in an attempt to feign jurisdiction. *Id.* To demonstrate a filing in bad faith, it must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal. *Id.* Legal certainty is analyzed by what appears on the face of the complaint; subsequent events—such as a valid defense offered by the defendant, or actual recovery in an amount less than the minimum jurisdictional amount—do not show plaintiff's bad faith or oust the jurisdiction. *Id.* For example, in *Tongkook Am., Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 783 (2d Cir. 1994) the plaintiff alleged over $100,000 in contract damages, but discovery revealed a letter of credit drawn on by plaintiff prior to the suit that reduced the disputed amount below the jurisdictional amount needed to support diversity jurisdiction. The Court of Appeals for the Second Circuit affirmed dismissal, noting that when the suit was commenced, the balance due was actually below the requisite amount. *Tongkook*, 14 F.3d at 783. The Court rejected the argument that a plaintiff's subjective belief as to the amount in controversy at the time the complaint is filed is sufficient to create

good faith, we relied on the fact that from the outset, plaintiff, to a legal certainty, could not recover the statutory jurisdictional amount. *Wolde-Meskel.*

104. Discovery revealed two points that plaintiff made a bad faith attempt to feign jurisdiction by exaggerating the plight of damages when the purported damage of losing business did not exist. First, the plaintiff alleged that it lost Furmano as a customer and consequently suffered damages in excess of $75,000, an allegation that was simply untrue. Furmano never ceased being plaintiff's customer. Second, the complaint alleged that plaintiff suffered compensatory and consequential damages in 2018 as a result of defendant doing business with Furmano in 2018. Meanwhile the opposite was true, in 2018 the plaintiff generated $37,723.25 revenues more than it did in all its prior years, including 2017. This means, at the time the complaint was filed on May 1, 2019, plaintiff had no reasonable basis for compensatory and consequential damages.

105. In fact, as evidenced by plaintiff's motion for summary judgment, the purported claim is at best $10,250 for purportedly violating a non-solicitation clause, far short of the diversity threshold. To cross the diversity threshold, Plaintiff's complaint alleged that it suffered severe damages by losing Furmano as a customer. Discovery revealed that Furmano continues being plaintiff's customer and that Furmano never ceased being plaintiff's customer; a material fact that was present on the day the complaint was filed, May 1, 2019.

106. The fact that plaintiff generated $37,723.25 revenues more in 2018 than it did in all its prior years, including 2017, is a fact that was present on the day the complaint was filed, May 1, 2019. (ECF 1).

107. Plaintiff pled in the complaint falsely, and in bad faith, that it lost Furmano as a customer and suffered as a result compensatory and consequential damages while knowing that these arguments are utterly false. Under these circumstances, the day the complaint was filed the Court did not have diversity jurisdiction and the plaintiff had no basis for asserting it.

108. Moreover, the proper measure of damages for breach of a covenant not to compete is the lost profits of which the plaintiff was deprived by reason of the defendant's improper competition. *Loughlin v. Meghji*, 186 A.D.3d 1633, 1638, 132 N.Y.S.3d 65, 72 (2020). A plaintiff has the burden of proving net lost profits due to the defendant's competition. *Id.* Anticipated lost profits cannot be based on speculation. *Id.* Consistent with *Loughlin,* on the day the complaint was filed, the maximum recoverable amount was at best the purported claim of $10,250, as 25% of the revenues that defendant generated from Furmano. Other than the purported claim of $10,250, plaintiff cannot prove any other loss of profits, leaving the Court without jurisdiction *ab initio.*

### IX. PLAINTIFF'S CLAIM OF $10,250 IS WRONG AND A QUESTION OF FACT EXISTS WHETHER THE ACTUAL 25% IS $9,975, AS SUCH PLAINTIFF CANNOT RECEIVE SUMMARY JUDGMENT

109. Plaintiff's seeks summary judgment of $10,250 on the 25% revenues that defendant generated from Furmano. However, a question of fact exists whether the actual 25% is $9,975.

110. A discrepancy exists, although defendant recorded a payment of $41,000, Defendant only received $39,900 and wrote-off one job of $1,100 as "paid" even though they did not receive an actual payment from Furmano. Indeed, the record of Furmano, which plaintiff produced, shows that Furmano paid defendant $39,900. A question of fact exists whether plaintiff is entitled to claim money that was not revenues, but a deficit to defendant. Thus, summary judgment must be denied on the amount $10,250.

111. In addition, on October 19, 2018, plaintiff misrepresented to defendant that its customer had "chopped" its rate and plaintiff requested the price be adjusted to $1,050, which defendant sympathetically agreed. Discovery revealed that Furmano had not chopped plaintiff's rate and Furmano was billed at the same rate as all prior trips to the same location. As such, defendant is entitled to offset the difference of the rate that was discounted based on a fraudulent misrepresentation, which must be determined at trial.

112.  Moreover, prior to the initiation of this case, plaintiff threatened with suit, defendant had repeatedly offered plaintiff to pay the purported 25% that plaintiff is now seeking in summary judgment. As plaintiff states, defendant "even offered to pay Plaintiff commissions on the loads Defendant transported for Furmano and any future loads." (Certification Rodney Waltman, dated June 18, 2021 ¶ 22). Plaintiff repeatedly refused those offers, because this case is not about resolving a controversy, it is all about plaintiff litigating the Freightguard Report and teaching defendant a lesson, and multiplying this controversy as much as possible. All the offers that defendant had made were settlement offers to avoid the heavy costs of litigation; they were not admissions of liability. Plaintiff is not entitled to use settlement offers as a basis for summary judgment.

113.  Finally, as much as plaintiff wishes to litigate the "Freightguard Report," the complaint did not assert any issue with the Freightguard Report or for defamation. The only claim before the Court is breach of contract. The rest is endless commentary not appropriate in this forum.

## X.  PLAINTIFF IS NOT ENTITLED TO PRESENT A DEPOSITION TRANSCRIPT AS EVIDENCE WHEN IN FACT THE PLAINTIFF REFUSED TO PRODUCE SUCH EVIDENCE.

114.  FRCP 30(e)(1) provides "On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being

notified by the officer that the transcript or recording is available in which: (A) to review the transcript or recording; and (B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them."

115. Fed. R. Civ. P. 26(b)(3)(C)(ii) "Any party or other person may, on request and without the required showing, obtain the person's own previous statement about the action or its subject matter. If the request is refused, the person may move for a court order, and Rule 37(a)(5) applies to the award of expenses. A previous statement is ... a contemporaneous stenographic, mechanical, electrical, or other recording--or a transcription of it--that recites substantially verbatim the person's oral statement."

116. Here in this case, defendant has prior to the deposition, at the deposition, and after the deposition asked the plaintiff to provide a transcript so the 30(b)(6) witness may review it for error. Plaintiff refused to provide such transcript.

117. As such, FRCP 37(c)(1) provides, "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial."

118. FRCP 5(d)(1)(A) provides that "disclosures under Rule 26(a)(1) or (2) and the following discovery requests and responses must not be filed until they are

used in the proceeding or the court orders filing: depositions, interrogatories, requests for documents or tangible things or to permit entry onto land, and requests for admission."

119.    The 2000 committee notes on FRCP 5(d)(1)(A) state "The amended rule provides that discovery materials and disclosures under Rule 26(a)(1) and (a)(2) must not be filed until they are 'used in the proceeding.' This phrase is meant to refer to proceedings in court. This filing requirement is not triggered by 'use' of discovery materials in other discovery activities, such as depositions. In connection with proceedings in court, however, the rule is to be interpreted broadly; any use of discovery materials in court in connection with a motion, a pretrial conference under Rule 16, or otherwise, should be interpreted as use in the proceeding. Once discovery or disclosure materials are used in the proceeding, the filing requirements of Rule 5(d) should apply to them."

120.    FRCP 26(a)(3)(A)(ii) provides "In addition to the disclosures required by Rule 26(a)(1) and (2), a party must provide to the other parties .... a transcript of the pertinent parts of the deposition."

121.    "This rule requires that copies of the transcript of a nonstenographic deposition be provided to other parties in advance of trial for verification, an obvious concern since counsel often utilize their own personnel to prepare transcripts from audio or video tapes." Fed. R. Civ. P. 26(a)(3)(B).

122. Plaintiff's failure to afford the defendant an opportunity to review the deposition transcript, the failure to produce the deposition transcript as relevant evidence, requires precluding plaintiff from advancing the transcript in support of its motion for summary judgment.

## CONCLUSION

123. Plaintiff erroneously looks for a judgment against defendant over the mental process of Furmano. Plaintiff and Furmano teamed up to hold defendant liable over the mental process of Furmano. This type of self-serving justice is contrary the equity and law that this Court follows.

**WHEREFORE** Defendant request that the Court enter an order denying summary judgment and entering judgment dismissing the complaint.

Dated: Brooklyn, NY
July 30, 2021

Respectfully submitted,

Levi Huebner & Associates PC

/s/ Levi Huebner

By: Levi Huebner