UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------------- X
                  :

EXPRESS FREIGHT SYSTEMS INC.,         :      20-CV-186 (ARR) (LB)
                  :

          *Plaintiff,*        :

                  :      **OPINION & ORDER**

    -against-            :

                  :

YMB ENTERPRISES INC.,           :

                  :

         *Defendant.*       :

                  X
---------------------------------------------------------------------- 

ROSS, United States District Judge:

Plaintiff Express Freight Systems Inc. ("Express Freight") brings this diversity action asserting a single claim of breach of contract against YMB Enterprises Inc. ("YMB"). Express Freight alleges that YMB violated the terms of their contract by soliciting business from and revealing confidential information to Express Freight's customer, Furmano Foods, Inc. ("Furmano"). Before me are two motions: YMB's motion to suppress what it claims is a "doctored transcript" of the January 18, 2021, deposition of its employee (the "suppression motion"), and Express Freight's motion for partial summary judgment. For the reasons described below, I deny YMB's suppression motion and grant in part and deny in part Express Freight's motion for partial summary judgment.

## PROCEDURAL HISTORY

Express Freight commenced this action on May 1, 2019, in the District of New Jersey against defendant YMB, its owner Joel Mendlovic, John Does 1−10, and ABC Corporations 1–10. Compl. ¶¶ 2−4, ECF No. 1. After defendants moved to dismiss the case for lack of personal jurisdiction, the matter was transferred to this District and, following additional motion practice,

moved to discovery.[1]

According to Magistrate Judge Bloom, who oversaw discovery in this case, discovery was acrimonious and required Court intervention on several occasions. Mar. 29, 2022 Op. & Order 3 ("Judge Bloom Op."), ECF No. 94. For example, the parties disputed YMB's failure to respond to interrogatories and document requests, as well as the Federal Rule of Civil Procedure 30(b)(6) deposition of YMB representatives. *Id*. Following the close of discovery, Express Freight sought permission to file a motion for summary judgment, *see* June 1, 2021 Letter, ECF No. 72, which I granted on June 4, 2021, *see* June 4, 2021 Docket Entry.

This matter took several procedural turns thereafter. On the same day that Express Freight moved for partial summary judgment, its counsel filed a motion for sanctions under Federal Rule of Civil Procedure 37(c)(2) against YMB and defense counsel, Pl.'s Mot. for Sanctions, ECF No. 75, which YMB opposed, *see* Decl. in Opp'n Pl.'s Mot. for Sanctions, ECF No. 87. On August 4, 2021, YMB cross-moved to suppress the January 18, 2021, Rule 30(b)(6) deposition of YMB employee, Volvie Mendlovic. Def.'s Cross-Mot. for Protective Order ("Def.'s Suppression Mot."), ECF No. 86, which Express Freight opposed, Pl.'s Resp. to Def.'s Cross-Mot. for Protective Order, ECF No. 91. By September 1, 2021, all three motions—Express Freight's motions for partial summary judgment and sanctions and YMB's motion to suppress the deposition transcript—were fully briefed.

On March 29, 2022, Judge Bloom issued an Opinion & Order (the "Opinion") denying Express Freight's motion for sanctions without prejudice and denying YMB's suppression motion. *See* Judge Bloom Op. Pursuant to Federal Rule of Civil Procedure 72, objections by either party

---

[1] Among the motions filed was a motion to dismiss by YMB. *See* Mot. to Dismiss, ECF No. 43. Though I denied the motion as to the claims against YMB, I did dismiss Joel Mendlovic as a defendant. *See* Order, ECF No. 45

were due April 12, 2022. Rather than timely requesting an extension of time to file objections, however, defense counsel filed a letter motion on the evening of April 12, contending that an extension of time was necessary to first resolve the proper standard of review to be accorded to Judge Bloom's Opinion. *See* Def.'s Letter Mot. for Extension of Time to File Objs., ECF No. 95. In the interest of judicial efficiency and considering the timing of defense counsel's request, I instructed YMB to file its objections by April 19 and explain therein the bases for its objections under both clear error and *de novo* standards of review. Apr. 14, 2022 Docket Entry. YMB subsequently filed its objections, *see* Def.'s Objs., ECF No. 100, to which Express Freight responded on April 25, 2022, *see* Pl.'s Opp'n to Def.'s Objs., ECF No. 102.

This procedural history brings me to the two motions that now require resolution: YMB's objections to Judge Bloom's Opinion denying its suppression motion and Express Freight's motion for partial summary judgment. Because adjudication of YMB's motion will determine the evidentiary record that I consider in resolving Express Freight's motion, I begin my analysis there.

### *Standard of Review*

YMB contends that its motion to suppress is a dispositive motion because it is "intertwined with" Express Freight's motion for partial summary judgment and thus determinative of this matter. S*ee* Def.'s Objs. 1. Indeed, Express Freight substantially relies upon Volvie Mendlovic's deposition in proffering the parties' undisputed facts. *See, e.g.*, Pl.'s Rule 56.1 Statement ¶¶ 12−13 ("Pl.'s 56.1"), ECF No. 88-2. On this basis, YMB asks that I take the substantial step of vacating Judge Bloom's Opinion because it was issued without authority, *see* Def.'s Objs. 2: I did not refer YMB's suppression motion to Judge Bloom, nor was Judge Bloom's Opinion issued as a report and recommendation. In the alternative, YMB requests that I treat Judge Bloom's Opinion as a report and recommendation and review it *de novo. See id.* at 3; *see also DiPilato v. 7-Eleven, Inc.*,

662 F. Supp. 2d 333, 340 (S.D.N.Y. 2009) ("When reviewing a dispositive order, 'a judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made.'" (quoting 28 U.S.C. § 636(b)(1)(C))).

To be sure, whether YMB's suppression motion is dispositive is material to my review of Judge Bloom's Opinion. Pursuant to 28 U.S.C. § 636(b)(1)(A), a magistrate judge may "hear and determine any pretrial matter pending before the court," with the exception of certain enumerated matters, and my review of their determination is limited to whether the "order is clearly erroneous or contrary to law." By contrast, the exempted matters listed in § 636(b)(1)(A)—which are considered dispositive—may be reviewed by a magistrate judge for "proposed findings of fact and recommendations for the disposition," of the motion, 28 U.S.C. § 636(b)(1)(B), and any party objections made thereto trigger a *de novo* review, 28 U.S.C. § 636(b)(1)(C).

Although a motion to suppress a deposition transcript is not among the enumerated matters exempted from § 636(b)(1)(A), the Second Circuit has held that this list is non-exhaustive. *See Williams v. Beemiller, Inc.*, 527 F.3d 259, 265 (2d Cir. 2008). Rather, "[t]o determine if a motion not enumerated in § 636(b)(1)(A) is dispositive" and thus subject to *de novo* review, a court is to look at the "practical effect of the challenged action on the instant litigation." *Chen-Oster v. Goldman, Sachs & Co.*, No. 10-CV-6950, 2016 WL 11645644, at *1–2 (S.D.N.Y. June 6, 2016) (quoting *Williams*, 527 F.3d at 265). Ordinarily, therefore, resolution of YMB's objections would require a closer analysis of the practical effect of YMB's suppression motion on this matter. I need not undertake such analysis here, however, as assuming *arguendo* that the motion is dispositive, I agree with Judge Bloom's disposition on *de novo* review.[2]

_____

[2] Even assuming YMB's motion is dispositive, I decline to take the substantial action urged by YMB: vacatur of Judge Bloom's Opinion. Instead, I treat the Opinion as a report and recommendation and review the portions objected to by YMB—denial of YMB's suppression

### *Denial of YMB's Suppression Motion is Proper*

YMB moved to suppress an allegedly "doctored transcript" of the January 18, 2021, deposition of Volvie Mendlovic, a YMB employee, on the grounds that Express Freight violated a litany of Federal Rules of Civil Procedure by refusing to provide YMB with a copy of the transcript. *See generally*, Def.'s Suppression Mot. YMB also alleged that suppression was appropriate because Express Freight "edited the [deposition] transcript," Def.'s Letter Mot. For Pre-Mot. Conf. 3, ECF No. 76—a considerable accusation to make.

In her Opinion, Judge Bloom concluded that none of YMB's arguments were meritorious and that its version of events was, quite simply, incredible. *See* Judge Bloom Op. 6–15. Having reviewed *de novo* the record, the Opinion, YMB's objections thereto, and Express Freight's response, I concur with Judge Bloom and adopt her Opinion in its entirety. YMB's suppression motion is both unsupported by law and untethered from the evidentiary record. While I decline to detail all the ways in which YMB's motion misconstrues the Federal Rules of Civil Procedure, there is one point I wish to emphasize. In its objections, YMB accuses Judge Bloom of "producing a new and radical approach[:] that a party can withhold until trial any deposition transcript that it will offer to support a claim or defense without ever providing it to the adversary." Def.'s Objs. 4. Not only is this assertion misguided, *see* Fed. R. Civ. P. 30(e)(1), 30(f)(3), but, as Judge Bloom emphasized in her Opinion, "the Federal Rules of Civil Procedure expressly provide that any party is entitled to order a copy of a deposition transcript," Judge Bloom Op. 7. At any point, YMB could have obtained the deposition transcript of Volvie Mendlovic itself; instead, it has chosen to expend ample resources accusing Express Freight of foul play.

Having determined that Volvie Mendlovic's deposition is admissible and may thus be

---

motion—*de novo*.

considered as part of the record in this case, I now turn to Express Freight's motion for partial summary judgment.

## BACKGROUND[3]

Express Freight is a transportation broker that arranges for the intrastate and interstate transportation of freight. Pl.'s 56.1 ¶ 1; Def.'s Reply Rule 56.1 Statement ¶ 1 ("Def.'s Reply 56.1"), ECF No. 89-4.[4] Express Freight specializes in arranging for the hauling of freight for companies in the food industry, *id.*, and, when retained by a company, works with a carrier to have the freight transported. Pl.'s 56.1 ¶3; Def.'s Reply 56.1 ¶ 3. Under this arrangement, the company is considered Express Freight's customer, not the carrier's. Pl.'s 56.1 ¶¶ 3, 5; Def.'s Reply 56.1 ¶¶ 3, 5. Indeed, the company does not pay or contract with the carrier, but instead works with and pays Express Freight exclusively. Pl.'s 56.1 ¶3; Def.'s Reply 56.1 ¶ 3. Express Freight pays the

---

[3] The following undisputed facts are taken from the parties' respective Local Rule 56.1 statements and the exhibits attached to their briefing on summary judgment. *See* Southern and Eastern Districts of New York Local Civil Rule 56.1(a); Fed. R. Civ. P. 56(c)(1)(A) & (3). Several facts proffered by Express Freight in its Rule 56.1 Statement cite to the deposition of Volvie Mendlovic. YMB disputes some of these facts based only on the admissibility of Mr. Mendlovic's deposition and others on the substance of the fact declared. *Compare, e.g.*, Def.'s Reply Rule 56.1 Statement ¶ 13 ("Def.'s Reply 56.1"), ECF No. 89-4, *with id.* ¶ 16. Because I concluded that Mr. Mendlovic's deposition is admissible, *see supra*, I consider as undisputed those facts submitted by Express Freight which YMB disputes only on the basis of the deposition's admissibility. In addition, although YMB filed a counterstatement in response to Express Freight's Rule 56.1 Statement, Express Freight did not file a counterstatement in response to YMB's Rule 56.1 Statement. I therefore deem admitted those facts from YMB's Rule 56.1 Statement that are supported by the record and that do not contradict Express Freight's own Rule 56.1 Statement. *See Suares v. Cityscape Tours, Inc.*, 603 F. App'x 16, 18 (2d Cir. 2015) (summary order) (holding that the district court "acted within its discretion in deeming all facts in [the] defendants' Local Rule 56.1 [S]tatement admitted" when the plaintiff did not submit a counterstatement); *Versace v. Versace*, 01-CV-9645 (PKL), 2003 WL 22023946, at *1 (S.D.N.Y. Aug. 27, 2003) (collecting cases).

[4] YMB's Rule 56.1 Statement and Rule 56.1 Counterstatement are contained in the same document. *See* ECF No. 89-4. For ease of reference, I refer to YMB's Rule 56.1 Counterstatement, which begins on page seventeen of the document, as YMB's "Reply 56.1 Statement," and YMB's Rule 56.1 Statement, which begins on page one of the document, as YMB's "Rule 56.1 Statement."

carrier in turn and keeps the remaining monies as profit. Pl.'s 56.1 ¶ 4; Def.'s Reply 56.1 ¶ 4.

Beginning sometime in 2013, Express Freight received requests from Furmano, a family-owned food manufacturing company located in Northumberland, Pennsylvania, to arrange for the transportation of freight from Furmano's location in Pennsylvania to its customers in other states. Pl.'s 56.1 ¶ 7; Def.'s Reply 56.1 ¶ 7. Over the next several years, Express Freight arranged for the transportation of Furmano's freight. *Id.* In July 2018, Express Freight posted an advertisement on an industry website, seeking carriers to transport freight from Furmano. Pl.'s 56.1 ¶ 10; Def.'s Reply 56.1 ¶ 10. In its advertisement, Express Freight identified Furmano as its customer, the date of pickup from Furmano, the date of delivery to the  freight's destination, and the type of equipment that would be required to haul the load. Pl.'s 56.1 ¶ 11; Def.'s Reply 56.1 ¶ 11. YMB, a carrier and defendant in this case, contacted Express Freight in response to the advertisement. Pl.'s 56.1 ¶¶ 12−13; Def.'s Reply 56.1 ¶¶ 12−13. Although YMB had never worked directly with Furmano, it was familiar with the company because it had previously transported freight from Furmano arranged through other brokers. Pl.'s 56.1 ¶ 14; Def.'s Reply 56.1 ¶ 14; *see also* Def.'s Rule 56.1 Statement ¶ 13 ("Def.'s 56.1"), ECF No. 89-4.

On July 26, 2018, YMB was presented with Express Freight's standard contract (the "Contract") for the transportation of Furmano's freight. Pl.'s 56.1 ¶ 15; Def.'s Reply 56.1 ¶ 15. YMB signed the Contract and returned the signed copy to Express Freight without requesting any changes to or raising any concerns about the terms therein. *Id.* According to YMB, it entered the Contract because it anticipated regularly receiving dispatches of freight from Express Freight, Def.'s 56.1 ¶¶ 57−58, 67: Under the terms of the Contract, Express Freight agreed to offer for shipment and YMB agreed to transport on its own equipment "at least 100,000 pounds annually in a series of shipment[s] and additional quantities of freight as [Express Freight] may tender

subject to the availability of suitable equipment." Cert. of Rodney Weltman, Ex. B ¶ 3 ("Contract"), ECF No. 88-3.

The Contract also contained two covenants restraining YMB from engaging in certain conduct. Pursuant to the first covenant, a non-solicitation provision, YMB "agree[d] to support and protect [Express Freight's] effort in performance of [the Contract] by refraining from ANY direct contact or solicitation of [Express Freight's] customers." Contract ¶ 11. In particular, "[d]uring the term of [the] agreement and for a period of [two] years from the time of termination of [the] agreement," YMB agreed to "not directly or indirectly solicit or do business of a transportation or warehouse nature with any of [Express Freight's] customers who [were] serviced by [YMB] as a result of [the] agreement unless otherwise agreed to in writing." *Id.* If YMB breached this provision and the "customer tender[ed] freight to [YMB] directly," YMB agreed to pay Express Freight twenty-five percent of its transportation revenue received on the movement of the customer's freight, as well as any damages incurred by Express Freight. *Id.*; *see also* Pl.'s 56.1 ¶ 21; Def.'s Reply 56.1 ¶ 21. According to Express Freight, this restrictive covenant served two purposes. It both ensured the vitality of Express Freight's business with Furmano by precluding YMB from cutting Express Freight out of transportation arrangements and preserved "the good will" between Furmano and Express Freight by guaranteeing that any issues arising from the transportation of Furmano' freight would be addressed by Express Freight directly. *See* Pl.'s 56.1 ¶¶ 23−24. The second restrictive covenant, a confidentiality provision, precluded YMB from revealing to any third party "the terms of [the Contract], the pricing of transportation services, or any other details of the business conducted between [YMB] and [Express Freight]." Contract ¶ 13.

Between July 26, 2018, and October 16, 2018, YMB hauled freight from Furmano on seven separate jobs that were arranged by Express Freight and for which Express Freight paid YMB.

Def.'s 56.1 ¶ 26−27; Pl.'s 56.1 ¶ 35; Def.'s Reply 56.1 ¶ 35. According to YMB, however, this represented just a fraction of the total transportation jobs that Express Freight received from Furmano over these months. Def.'s 56.1 ¶¶ 29−30 (alleging that Express Freight offered YMB only seven out of thirty-six Furmano dispatches). YMB moreover alleges that during this time, it had suitable equipment for transporting between 60 to 100 loads of Furmano freight per month. Def.'s 56.1 ¶ 25.

Beginning in October of 2018, YMB began servicing Furmano directly, Pl.'s 56.1 ¶ 40; Def.'s Reply 56.1 ¶ 40, bypassing Express Freight, which serves the basis of this matter. While the parties agree that YMB's first job for Furmano took place on October 18, 2021, *see* Pl.'s 56.1 ¶ 47; Def.'s Reply 56.1 ¶ 47, they disagree on how YMB came to work directly for Furmano. According to Express Freight, in or around October 2018, Volvie Mendlovic, who was responsible for arranging transportation jobs for YMB, *see* Pl.'s 56.1 ¶ 13; Def.'s Reply 56.1 ¶ 13, contacted Furmano about transporting freight directly from them and offered to perform this work for at least $100 less per load than what Express Freight was charging Furmano, Pl.'s 56.1 ¶ 38. Furmano accepted this offer and, beginning on October 18 and continuing through the end of December 2018, assigned YMB jobs without using Express Freight as an intermediary. *Id.* ¶ 40. By contrast, YMB alleges that on October 5, 2018, it was contacted by Furmano, which relayed that it would no longer be offering freight through Express Freight. Def.'s 56.1 ¶¶ 33−34. YMB was "under the impression that Furmano [was] not satisfied" with Express Freight and feared that if it did not accept freight directly from Furmano, it would suffer financially. *See id.* ¶¶ 6−7, 33−34. Accordingly, YMB began servicing Furmano directly on October 18. *Id.* ¶ 36.

During the time that YMB was servicing Furmano directly, it also transported Furmano freight brokered by Express Freight on two occasions—once on October 19, 2018, the day after

YMB began working directly with Furmano, and the other on October 22, 2018. Pl.'s 56.1 ¶ 44; Def.'s Reply 56.1 ¶ 41. At some point, Express Freight learned that YMB was servicing Furmano directly and confronted YMB. Pl.'s 56.1 ¶¶ 46; Def.'s Reply 56.1 ¶¶ 46. After their discussion, YMB ceased transporting freight from Furmano directly; YMB alleges that it stopped accepting freight from Furmano on December 17, 2018. Pl.'s 56.1 ¶ 46; Def.'s Reply 56.1 ¶ 46; Def.'s 56.1 ¶ 41.

YMB was paid by Furmano for the freight it tendered between October and December, although the parties also disagree on how much.[5] Pl.'s 56.1 ¶ 42; Def.'s Reply 56.1 ¶ 42; Def.'s 56.1 ¶ 54. Based on YMB's invoices to and payments from Furmano, as well as the January 18, 2021, deposition of Volvie Mendlovic, Express Freight contends that YMB was paid a total of $41,000 for the jobs it performed directly for Furmano. *See* Pl.'s 56.1 ¶ 42; Pl.'s Reply in Supp. of Mot. for Partial Summ. J. 12 ("Pl.'s Summ. J. Reply"), ECF No. 90. YMB alleges that although it recorded a payment of $41,000 from Furmano, it "wrote-off one job of $1,100 as 'paid'" even though the payment by Furmano was never made. Def.'s 56.1 ¶ 53. YMB proffers that its payment from Furmano was thus only $39,900. *Id.* ¶ 54.

Express Freight now moves for partial summary judgment against YMB, alleging that YMB breached the Contract as a matter of law. *See* Pl.'s Mem. of Law in Supp. of Mot. for Partial Summ. J. 2 ("Pl.'s Summ. J. Mot."), ECF No. 88-5. Express Freight seeks twenty-five

---

[5] Separate from the amount that YMB was paid by Furmano, the parties also disagree on the damages incurred by Express Freight as a result of YMB's work for Furmano. *Compare* Compl. ¶ 13, ECF No. 1 (explaining that because of its business directly with YMB, Furmano "virtually ceased" using Express Freight's brokerage services), *with* Def.'s 56.1 ¶ 43 (describing the dispatches that Express Freight received from Furmano between 2019 and 2020). Because Express Freight has requested that these additional damages be determined at a future plenary hearing or trial, *see* Pl.'s Mem. of Law in Supp. of Mot. for Partial Summ. J. 6 ("Pl.'s Summ. J. Mot."), ECF No. 88-5, I need not address each party's proffered facts on this point.

percent of the revenue YMB received from working directly with Furmano and accordingly asks that I enter judgment in the amount of $10,250, together with additional damages to be established at a future plenary hearing or trial. *Id.* at 5−6.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The function of the court is not to resolve disputed issues, but to determine whether there is a genuine issue to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "While genuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (citation and internal quotation marks and ellipses omitted)).

In assessing whether summary judgment is appropriate, I am to consider "the pleadings, depositions, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011) (citation omitted); *see* Fed R Civ P 56.1. The moving party carries the burden of proving that there is no genuine dispute regarding any material fact and "may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223–24 (2d Cir. 1994); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once this burden is met, in order to avoid the entry of summary judgment, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial." *LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998) (citation omitted). "[T]he non-moving party must offer such proof as would allow a reasonable juror to return a verdict in his favor, and only when that proof is slight is summary

judgment appropriate." *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000) (first citing *Anderson*, 477 U.S. at 256, and then citing *Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988)). In reviewing the record before me, I am "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997).

## DISCUSSION

Express Freight contends that it is entitled to partial summary judgment as a matter of law because YMB, by servicing Furmano directly, violated the Contract's non-solicitation provision.[6] Pl.'s Summ. J. Mot. 5. In defense of the legality of its business with Furmano, YMB advances two arguments.[7] First, YMB alleges that the Contract's non-solicitation provision is unenforceable because it constitutes an unreasonable restriction against competition. *See* Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J. 20−29 ("Def.'s Opp'n"), ECF No. 89-5. YMB next argues that whether Express Freight adequately performed under the Contract—an essential element for a breach-of-contract claim—is a factual issue to be resolved at trial. Def.'s Opp'n 29−32.  I review each

---

[6] Although Express Freight's Complaint alleges that YMB "solicited Furmano using [Express Freight's] confidential and proprietary pricing structure," in violation of the Contract's confidentiality provision, *see* Compl. ¶ 11, ECF No. 1, Express Freight does not move for partial summary judgment on this basis. The reason appears to be—as explained by Express Freight in its reply brief—that "the manner employed by [YMB] to get Furmano's business" is ultimately irrelevant if I find that YMB breached the Contract's non-solicitation provision. *See* Pl.'s Reply in Supp. of Mot. for Partial Summ. J. 9−10 ("Pl.'s Summ. J. Reply"), ECF No. 90.

[7] In addition to requesting that I deny Express Freight's motion for partial summary judgment, YMB also asks that I dismiss the complaint in this action. *See* Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J. 45 ("Def.'s Opp'n"), ECF No. 89-5. This request is both curious and without merit: YMB's response to Express Freight's motion does not appear to be a cross-motion for summary judgment, nor has YMB provided any authority for why dismissal of the complaint would be appropriate at this juncture.

argument in turn.[8]

## I.    The Contract's Restrictive Covenant is Enforceable.

YMB's argument that the Contract's non-solicitation provision is unenforceable appears

twofold. YMB alleges that the covenant is an unreasonable restriction against competition for

which Express Freight cannot show a legitimate interest, and that it is unenforceable because it

---

[8] YMB makes several other arguments in opposition to summary judgment that I address only briefly. First, YMB alleges that Express Freight cannot prove that YMB used Express Freight's proprietary pricing structure to undercut Express Freight's relationship with Furmano. *See* Def.'s Opp'n 33−34. But as explained *supra* n.6, Express Freight does not move for summary judgment on this ground. YMB next submits that summary judgment is improper because Express Freight's purported damages are speculative and cannot be attributed to YMB's work with Furmano. *See* Def.'s Opp'n 34−37. As also just explained, *see supra*, Background & n.5, Express Freight has requested that damages be determined at a future plenary hearing or trial, *see* Pl.'s Partial Summ. J. Mot. 6. The only issue currently before me is whether, as a matter of law, YMB breached its Contract with Express Freight, entitling Express Freight to liquidated damages in the amount prescribed in the Contract's non-solicitation clause. Finally, YMB propounds an argument already advanced in its first motion to dismiss, *see* Def.'s Brief in Supp. of First Mot. to Dismiss 4−5, ECF No. 15-5, and denied as meritless by a previous court, *see* R. & R. 2−3, ECF No. 27, *adopted* ECF No. 28: that Express Freight's complaint was filed in bad faith because Express Freight "feign[ed] jurisdiction" by "exaggerating" the damages it incurred as a result of YMB's conduct, Def.'s Opp'n 39. "Satisfaction of the § 1332(a) diversity requirements (amount in controversy and citizenship) is determined as of the date that suit is filed—the 'time-of-filing' rule." *Wolde-Meskel v. Vocational Instruction Project Cmty. Servs., Inc.*, 166 F.3d 59, 62 (2d Cir. 1999). It is well settled that "a federal court does not lose jurisdiction over a diversity action which was well founded at the outset even though one of the parties may later change domicile or the amount recovered falls short of [the statutory minimum]." *Rosado v. Wyman*, 397 U.S. 397, 405 n. 6 (1970). To demonstrate a filing in bad faith, therefore, "it must appear to a legal certainty that the claim is really for less." *Wolde-Meskel*, 166 F.3d at 63 (internal citation omitted). Legal certainty, in turn, is "analyzed by what appears on the face of the complaint." *Id.* In its complaint, Express Freight established § 1332's amount-in-controversy requirement by pleading, *inter alia*, that YMB's work for Furmano caused Express Freight to lose Furmano's business, which was worth well over $75,000. Compl. ¶¶ 10, 28. YMB now contends, without citing any authority, that Express Freight and Furmano continued to do business together after YMB's alleged breach of contract and were in business together at the time that Express Freight filed its complaint. *See* Def.'s Opp'n 39. Contrary to YMB's claim, however, the evidentiary record does not establish that Express Freight's business with Furmano proceeded undisturbed after YMB began servicing Furmano directly. *Compare* Def.'s Opp'n, Ex. Q, ECF No. 89-3 (Express Freight's economic loss report), *with* Def.'s Opp'n, Ex. F (YMB's report on Express Freight's economic losses). Accordingly, YMB's argument of bad faith is meritless.

precluded YMB from doing business with its own customers. *See* Def.'s Opp'n 20−28.

Under New York law,[9] the enforceability of a restrictive covenant depends on whether the underlying contract is a contract for the sale of a business, an employment contract, or an ordinary commercial contract. *See DAR & Assocs., Inc. v. Uniforce Servs., Inc.*, 37 F. Supp. 2d 192, 196 (E.D.N.Y. 1999); *Steelite Int'l U.S.A., Inc. v. McManus*, No. 21-CV-2645 (LAK), 2021 WL 1648025, at *5 (S.D.N.Y. Apr. 27, 2021). Restrictive covenants "that are incidental to the sale of a business usually are enforced because the buyer has in part bargained for the good will of the seller's customers." *Steelite*, 2021 WL 1648025, at *5 (internal quotation marks and citation omitted). By contrast, such covenants are "viewed with suspicion," *Spherenomics Glob. Contact Centers v. vCustomer Corp*, 427 F. Supp. 2d 236, 249 (E.D.N.Y. 2006), in employment contracts "because of the powerful considerations of public policy which militate against the sanctioning of a person's livelihood," *Steelite*, 2021 WL 1648025, at *5. Thus, they are strictly construed. *Id.* On the other hand, restrictive covenants in ordinary commercial contracts, like the Contract between YMB and Express Freight, are analyzed "under a simple rule of reason, balancing the competing public policies in favor of robust competition and freedom to contract." *DAR & Assocs.*, Inc., 37 F. Supp. 2d at 197. This analysis accords more deference to parties' freedom to contract, *Mathias v. Jacobs*, 167 F. Supp. 2d 606, 612 (S.D.N.Y. 2001), and considers three principal factors: "(1) whether the covenant protects a legitimate business interest; (2) the reasonableness of the covenant with respect to geographic scope and temporal duration; and (3) the degree of hardship upon the

---

[9] Although the Contract is silent on which state law governs in the event of a breach, because this action was filed in a district court within New York State, both parties rely exclusively on New York State law in their briefing, and neither party has suggested that the law of a state other than New York should apply, I apply New York law in resolving Express Freight's motion for partial summary judgment. *See Omni Consulting Grp., Inc. v. Marina Consulting, Inc.*, No. 01-CV-511A, 2007 WL 2693813, at *4 & n.6 (W.D.N.Y. Sept. 12, 2007), *aff'd sub nom. Omni Consulting Grp., Inc. v. Pilgrim's Pride Corp.*, 488 F. App'x 478 (2d Cir. 2012) (summary order).

party against whom the covenant is enforced." *Crye Precision LLC v. Duro Textiles, LLC*, No. 15-CV-1681 (DLC), 2016 WL 1629343, at \*5 (S.D.N.Y. Apr. 22, 2016), *aff'd*, 689 F. App'x 104 (2d Cir. 2017); *see Calico Cottage, Inc. v. TNB, Inc.*, No. 11-CV-336 (MDG), 2014 WL 4828774, at \*5 (E.D.N.Y. Sept. 29, 2014). "The application of these factors 'depends entirely on the totality of circumstances.'" *Crye Precision LLC*, 2016 WL 1629343, at \*5 (quoting *Greenwich Mills Co. v. Barrie House Coffee Co.*, 459 N.Y.S.2d 454, 456 (2d Dep't 1983)).

Applying the "rule of reason" analysis to the Contract, I find the restrictive covenant at issue—the Contract's non-solicitation provision—enforceable.[10] Pursuant to the non-solicitation provision, YMB was restrained from "directly or indirectly solicit[ing] or do[ing] business of a transportation or warehouse nature with any of [Express Freight's] customers who [were] serviced by [YMB] as a result of the [Contract] unless otherwise agreed to in writing." Contract ¶ 11. While "[a] restrictive covenant may not merely insulate a party from competition," *Steelite Int'l U.S.A., Inc.*, 2021 WL 1648025, at \*7 (internal quotation marks and citation omitted), protectible business interests under the "rule of reason" test include the prevention of unfair competition and the protection of a party's rights in its trademarks or goodwill, *id.* According to Express Freight, the Contract's restrictive covenant was here intended to protect Express Freight's "interest in

---

[10] In its response to Express Freight's motion for partial summary judgment, YMB submits that the Contract's non-solicitation clause "must be strictly construed" and upheld only if the restraint—here, prohibiting YMB from servicing Furmano directly—"is no greater than is required for the protection of [Express Freight's] legitimate interest." Def.'s Opp'n 20. However, this is not the standard for evaluating restrictive covenants in commercial contracts, but rather the more exacting standard applied to employment contracts. *See, e.g.*, *Long Island Minimally Invasive Surgery, P.C. v. St. John's Episcopal Hosp.*, 83 N.Y.S.3d 514, 516 (2d Dept. 2018) ("Agreements restricting an individual's right to work or compete are not favored and thus are strictly construed" (internal citation omitted)). Indeed, the cases to which YMB cites in its response brief concern restrictive covenants arising in employment contracts and are thus inapposite. *See, e.g.*, Def.'s Opp'n 20 (citing *Adecco USA, Inc. v. Staffworks, Inc.*, No. 6:20-CV-744 (MAD), 2020 WL 7028872, at \*5 (N.D.N.Y. Sept. 15, 2020), wherein the court assessed the reasonability of an employment-related restrictive covenant)).

preventing the carriers it hires to transport freight from its customers from simultaneously working directly with [Express Freight's] customers." Pl.'s Summ. J. Reply 5. Rather than completely insulate Express Freight from competition, this provision's purpose was to prevent Express Freight from being undermined by the carriers it contracted with—who likely gained access to clients and industry information through their work with Express Freight. *Id.* I agree. Allowing YMB, which had never serviced Furmano directly, *see* Def.'s Reply 56.1 ¶ 14, to financially benefit from its contract with Express Freight and from Express Freight's role as an intermediary while undercutting Express Freight's business with Furmano would indeed amount to unfair competition. Accordingly, I find the first factor—protection of a legitimate business interest—satisfied.

Moreover, the restrictive covenant was reasonable with respect to geographic scope and temporal duration and did not impose undue hardship upon YMB, the second and third factors of the "rule of reason" test. "The reasonableness of the [restraint] must be assessed in light of the fact that it was negotiated by sophisticated business[people]." *Spheronomics*, 427 F. Supp. 2d at 250. Here, YMB does "not contend that [it was] coerced into agreeing to the restrictive covenant in the [Contract], or that [it] lacked any meaningful choice with regard to accepting it." *BP Prods. N. Am. Inc. v. Motor Parkway Amoco*, No. CV-06-0833 (SJF), 2006 WL 6928862, at *4 (E.D.N.Y. Aug. 21, 2006). Against this backdrop, the duration of the provision—two years following the termination of the Contract, *see* Contract ¶ 11—was reasonable, *see BP Prods.*, 2006 WL 6928862, at *4 ("[T]he five-year duration of the term at issue is reasonable considering that [it] was an arm's length transaction between sophisticated businesspeople."). Nor was the restrictive covenant unreasonable with respect to scope: pursuant to the covenant, YMB was restricted only from doing business directly with Furmano, *not* from transporting freight from Furmano that was arranged by

other brokers. *See* Contract ¶ 11; Pl.'s Summ. J. Reply 5. Finally, YMB has not argued, nor do I find, that the non-solicitation provision imposed undue hardship on YMB. YMB was free to service Furmano through jobs arranged by other brokers, and even the Contract itself entitled YMB to service Furmano directly if agreed to in writing by the parties. Contract ¶ 11; *see also Spherenomics*, 427 F. Supp. 2d at 250. Based on the foregoing, I find that the Contract's restrictive covenant was a reasonable restriction.

Although YMB's next argument is difficult to parse, it appears to be that I should find the non-solicitation provision unenforceable because it precluded YMB from doing "direct business with its own customer and [did] not distinguish between customers gained through [Express Freight] and those gained from other sources."[11] Def.'s Opp'n 28. YMB alleges that such a restraint is "void as contrary to public policy" because it is an "overbroad restriction to [] prohibit [an entity] from doing business with customers [with whom] it was [already] acquainted." *Id.* As an initial matter, whether Furmano was YMB's customer before YMB entered the Contract seems unlikely, though it is a question I need not answer. *See* Pl.'s 56.1 ¶¶ 3, 5, 14; Def.'s Reply 56.1 ¶¶ 3, 5, 14 (explaining that (1) when a company hires a broker, like Express Freight, the company is

---

[11] Relatedly, YMB alleges that "[Express Freight] stretches the contract beyond its words to declare that once [YMB] signed the contract, [it] was also precluded from doing any business with customers [it] knew beforehand." Def.'s Opp'n 25. This misstates the terms of the contract, however. Under the restrictive covenant, YMB was precluded from doing any *direct* business with Express Freight's customers who were serviced by YMB pursuant to the contract. *See* Contract ¶ 11. Additionally, whether YMB believed, at the time of signing the Contract, that the non-solicitation provision did not apply to companies with whom it was already acquainted is immaterial because "[u]nder New York law, courts will not look beyond the four corners of a contract unless the contractual terms are ambiguous." *PB Americas Inc. v. Cont'l Cas. Co.*, 690 F. Supp. 2d 242, 249 (S.D.N.Y. 2010); *see New York Wheel Owner LLC v. Mammoet Holding B.V.*, 481 F. Supp. 3d 216, 233 (S.D.N.Y. 2020) ("[W]here . . . the relevant contract language is unambiguous, there is no basis to look beyond the four corners of the contract at a party's subjective understanding or industry practice." (internal quotation marks and citation omitted)). Here, the terms of the Contract were clear: YMB was simply not allowed to work directly with Express Freight's customers, like Furmano, that were serviced by YMB as a result of the Contract.

the broker's customer, not the carrier's, and (2) prior to the Contract, YMB had serviced Furmano only through other brokers). Having just found that the restrictive covenant is reasonable, I find YMB's argument unavailing. The commercial contract was the result of "an arm's length transaction between sophisticated businesspeople." *BP Prods.*, 2006 WL 6928862, at *4. YMB neither was coerced into signing it, nor lacked any meaningful choice regarding its acceptance. *Id.* As such, YMB could have required that the Contract distinguish between customers learned of through Express Freight and those whom YMB knew prior to entering the Contract. It did not, however. While YMB may not like the terms of the Contract retrospectively, I decline to declare as void a reasonable restriction that was fairly bargained for by the parties. [12]

Having concluded that the restrictive covenant is enforceable, I now turn to whether YMB breached the Contract as a matter of law.

## II.    Defendant Breached the Contract.

"To state a claim for breach of contract under New York law, a complaint must allege four elements: '(1) the existence of an agreement, (2) adequate performance of the contract by [the party seeking enforcement], (3) breach of the contract by [the party against whom enforcement is sought], and (4) damages.'" *Donnenfeld v. Petro, Inc.*, 333 F. Supp. 3d 208, 218

---

[12] YMB seems to make two additional arguments in favor of the contract's unenforceability: (1) that the non-solicitation provision was an unlawful restraint because Express Freight was not required to offer all of Furmano's dispatches to YMB, and (2) that the restraint was a violation of N.Y. Gen. Bus. Law § 340, which protects against antitrust injuries, *see Naples v. Stefanelli*, 972 F. Supp. 2d 373, 397–98 (E.D.N.Y. 2013). Def.'s Opp'n 23. As to this first argument, the terms of the contract—under which Express Freight had to tender to YMB a minimum of 100,000 pounds of Furmano freight annually, *see* Contract ¶ 3—were both clear and the result of sophisticated negotiations. That Express Freight was not required by the contract to tender *all* of its Furmano freight to YMB does not render the restrictive covenant unenforceable, and Express Freight has cited no authority for such proposition. As to YMB's second argument, that the restraint violated N.Y. Gen. Bus. Law § 340, YMB makes this argument only briefly, without adequate argumentation. I thus decline to address it.

(E.D.N.Y. 2018) (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004)).

Based on the facts before me, there is no genuine dispute between the parties regarding the first, third, and fourth factors. On July 26, 2018, YMB and Express Freight entered into a contract, pursuant to which Express Freight agreed to offer for shipment and YMB agreed to transport on its own equipment "at least 100,000 pounds annually in a series of shipment[s] and additional quantities of freight [from Furmano] as [Express Freight] may tender subject to the availability of suitable equipment [by YMB]." Contract ¶ 3; *see* Pl.'s 56.1 ¶ 15; Def.'s Reply 56.1 ¶ 15. Under the Contract, YMB was prohibited from "directly or indirectly solicit[ing] or do[ing] business of a transportation or warehouse nature with any of [Express Freight's] customers who [were] serviced by [YMB] as a result of [the] agreement unless otherwise agreed to in writing." Contract ¶ 11. In spite of this provision, YMB began directly servicing Express Freight's customer, Furmano, in October 2018, while continuing to complete jobs for Express Freight on two occasions. *See* Pl.'s 56.1 ¶¶ 7, 11, 44, 47; Def.'s Reply 56.1 ¶¶ 7, 11, 39, 47. This was a clear breach of the Contract's restrictive covenant. Finally, because Furmano "tender[ed] freight to [YMB] directly," there are discernible damages, although, as discussed *infra*, the parties dispute the amount: the same restrictive covenant requires YMB to pay Express Freight twenty-five percent of its transportation revenue received from Furmano, as well as any damages incurred by Express Freight. *See* Contract ¶ 11; *see also* Pl.'s 56.1 ¶ 21; Def.'s Reply 56.1 ¶ 21.

YMB's principal contention in opposition to summary judgment is that the second factor— adequate performance by Express Freight—was not satisfied at the time of its breach because the "undisputed facts show [Express Freight's] lack of a good faith effort in performance of the [Contract]." Def.'s Opp'n 31. Specifically, YMB argues that although it was "ready, willing and

able to perform fulfilling all thirty-six [] dispatches" from Furmano that were given to Express Freight between July 26, 2018, and October 16, 2018—the period before YMB began transporting freight directly from Furmano—Express Freight offered YMB only seven of the dispatches. *Id.* at 31−32; *see also* Def.'s 56.1 ¶¶ 26−30.

The measure of whether a party has adequately performed under a contract is substantial performance. *See Optima Media Grp. Ltd. v. Bloomberg L.P.*, No. 17-CV-1898 (AJN), 2021 WL 1941878, at *8 (S.D.N.Y. May 14, 2021) ("In order to recover for breach of contract, a party must first show it substantially performed under that contract."). Thus, YMB's breach of the contract would be excused if Express Freight "substantially failed to perform its side of the bargain." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007). While "[t]here is no simple test for determining whether substantial performance has been rendered," factors that should be considered include the "ratio of the performance already rendered to that unperformed, the quantitative character of the default, the degree to which the purpose behind the contract has been frustrated, the willfulness of the default, and the extent to which the aggrieved party has already received the substantial benefit of the promised performance." *Hadden v. Consol. Edison Co. of New York*, 34 N.Y.2d 88, 96 (1974); *see also Bank of New York Mellon Tr. Co. v. Morgan Stanley Mortg. Cap., Inc.*, 821 F.3d 297, 312 (2d Cir. 2016). Determining whether a party has substantially performed in light of these factors is "usually a question of fact and should be decided as a matter of law only where the inferences are certain." *Merrill Lynch & Co. Inc.*, 500 F.3d at 186.

Based on the parties' undisputed facts, the inferences are here certain and support a finding that Express Freight had substantially performed at the time YMB breached the Contract. Under the Contract, Express Freight agreed to offer to YMB at least 100,000 pounds of Furmano freight

annually, over a series of shipments, and "additional quantities of freight as [Express Freight] *may* tender subject to the availability of suitable equipment." Contract ¶ 3 (emphasis added). Thus, while Express Freight was required to offer YMB a minimum of 100,000 pounds of freight between July 26, 2018, and July 26, 2019, it was not, by the express terms of the Contract, required to offer YMB all of the dispatches it received from Furmano. Between July 26, 2018, when the parties entered the Contract, Pl.'s 56.1 ¶ 15; Def.'s Reply 56.1 ¶ 15, and October 16, 2018—the last date before which YMB began servicing Furmano directly—Express Freight gave YMB seven different jobs for which it paid YMB. Def.'s 56.1 ¶ 26−27; Pl.'s 56.1 ¶ 35; Def.'s Reply 56.1 ¶ 35. Considered against the amount of time the parties had been in contract for—less than three months—it cannot be said that Express Freight failed to substantially perform. Indeed, by October 16, 2018, Express Freight had not defaulted, nor had it frustrated the purpose behind the contract, nor had YMB failed to receive a benefit of the promised performance. *Hadden*, 34 N.Y.2d at 96. Rather, Express Freight had already delivered to YMB a substantial number of jobs and intended to continue giving YMB jobs over the next nine months of their Contract. *See* Pl.'s Summ. J. Reply 8−9. Accordingly, I find as a matter of law that at the time that YMB breached the Contract, Express Freight had substantially performed.

Because there was an enforceable Contract between Express Freight and YMB, Express Freight adequately performed under the Contract, and YMB breached the Contract's non-solicitation provision, which provides for liquidated damages, I find that Express Freight is entitled to judgment on its breach-of-contract claim as a matter of law. The remaining question, therefore, is the amount of damages to which Express Freight is entitled. While Express Freight requests that any additional damages incurred by YMB's conduct, *see* Contract ¶ 11 (entitling Express Freight to liquidated damages and "any damages that may be incurred"), be determined at a future plenary

hearing or trial, it asks that at this juncture, I award Express Freight $10,250, which represents twenty-five percent of the $41,000 that YMB made working directly for Furmano. Pl.'s Summ. J. Mot. 6; Pl.'s Summ. J. Reply 10−11.  Though the Contract is clear that Express Freight is entitled to "a commission from [YMB] of [twenty-five percent] of the revenue received" from Furmano, Contract ¶ 11, the revenue YMB made off its work for Furmano is a question of fact disputed by the parties.

According to Express Freight, the record clearly establishes that YMB was paid $41,000 by Furmano because YMB's "self-prepared ledger reflecting invoices to and payments from Furmano," Express Freight's "self-prepared Payment Receipts documents," and Volvie Mendlovic's deposition all point to this number. See Pl.'s Summ. J. Reply 12. YMB alleges that this number was actually $39,900 because in its records, it "wrote-off one job of $1,100 [from Furmano] as 'paid'" even though the payment was never made. Def.'s 56.1 ¶¶ 53−54. Based on the evidence before me, the record is equivocal on the true amount. As an initial matter, Mr. Mendlovic's testimony is not as clear as Express Freight claims. When read aloud YMB's invoices to Furmano and asked whether they together totaled $41,000,  Mr. Mendlovic answered, "I didn't calculate it, but it looks like it." Aff. in Supp. Certification of Counsel, Ex. C at 134:1−18, ECF No. 88-4. Absent additional corroborating evidence, I decline to credit Mr. Mendlovic's "looks like it," as a clear admission that YMB was paid $41,000.[13] The other evidence in the record is also indecisive. While the YMB ledgers submitted by Express Freight indicate invoices to and payments from Furmano in the amount of $41,000, see Cert. of Rodney Weltman, Ex. G, ECF No. 88-3, Furmano's own payment history to YMB puts this number at $39,900, see Cert. of Rodney

---

[13] Indeed, in his affidavit, Mr. Mendlovic avers under penalty of perjury that YMB received only $39,900 from Furmano. See Def.'s Resp. in Opp'n to Pl.'s Mot., Ex. A at 9, ECF No. 89.

Weltman & *id.*, Ex. F, ECF No. 88-3 (January 7, 2019, email from Furmano employee to Express Freight owner Rodney Weltman attaching "all the YMB business [Furmano has] done directly through [YMB] and attaching 35-payment history totaling $39,900). Considering this conflicting evidence, I cannot say at this point that YMB was remunerated $41,000 by Furmano for its work. Accordingly, while Express Freight is entitled to twenty-five percent of YMB's commission from Furmano, what this amounts to in dollars cannot be determined as a matter of law. I thus grant Express Freight's motion for partial summary judgment on its breach of contract claim but deny its request for judgment in the amount of $10,250. Its liquidated and other damages shall be determined at a later plenary hearing or trial.

## CONCLUSION

For the foregoing reasons, Express Freight's motion for partial summary judgment is granted in part and denied in part. Specifically, I grant summary judgment on Express Freight's breach of contract claim but decline to award Express Freight $10,250 at this time. Rather, Express Freight's damages under the Contract's non-solicitation provision are to be determined in full at a later plenary hearing or trial, along with other damages.

SO ORDERED.

                                       /s/
                                   Allyne R. Ross
                                   United States District Judge

Dated:          August 25, 2022
                 Brooklyn, New York